Filed 11/25/25

# IN THE SUPREME COURT OF CALIFORNIA

TAKING OFFENSE,

Plaintiff and Appellant,

v.

STATE OF CALIFORNIA,

Defendant and Respondent.

S270535

Third Appellate District

C088485

Sacramento County Superior Court

34-2017-80002749-CU-WM-GDS

---

## ORDER MODIFYING OPINION

THE COURT:

The majority opinion in this matter, filed on November 6, 2025, is modified as follows:

1.  In the second sentence of the second full paragraph on page 2 of the slip opinion the word "wholly" is deleted so the sentence reads:

As explained below, we agree with the State that the present version of section 526a, as amended in 2018, does not allow standing to sue state officers or entities.

This modification does not affect the judgment.

# IN THE SUPREME COURT OF CALIFORNIA

TAKING OFFENSE,
Plaintiff and Appellant,

v.

STATE OF CALIFORNIA,
Defendant and Respondent.

S270535

Third Appellate District
C088485

Sacramento County Superior Court
34-2017-80002749-CU-WM-GDS

November 6, 2025

Chief Justice Guerrero authored the opinion of the Court, in which Justices Corrigan, Groban, Evans, and Jenkins[*] concurred.

Chief Justice Guerrero filed a concurring opinion, in which Justices Corrigan and Groban concurred.

---

[*] Retired Associate Justice of the Supreme Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Justice Kruger filed a concurring opinion, in which Justice Liu concurred.

TAKING OFFENSE v. STATE OF CALIFORNIA

S270535

Opinion of the Court by Guerrero, C. J.

In 2017, the Legislature enacted the Lesbian, Gay, Bisexual, and Transgender Long-Term Care Facility Residents' Bill of Rights. (Stats. 2017, ch. 483, amending Health & Saf. Code, div. 2 to add ch. 2.45; hereinafter enactment, or the LGBT Long-Term Care Residents' Bill of Rights.) The legislation comprehensively addresses issues concerning lesbian, gay, bisexual, and transgender (LGBT) seniors' access to, and treatment by, "[l]ong-term care facilit[ies]" — an umbrella term covering entities that provide services ranging from skilled nursing to residential personal care for the elderly. (Health & Saf. Code, § 1439.50, subd. (e).)[1]

Only one aspect of the enactment is at issue in this court. Health and Safety Code section 1439.51, subdivision (a)(5) prohibits staff at long-term care facilities from "[w]illfully and repeatedly fail[ing] to use a resident's preferred name or pronouns after being clearly informed of the preferred name or pronouns," when they do so "wholly or partially on the basis of a person's actual or perceived sexual orientation, gender identity, gender expression, or human immunodeficiency virus (HIV) status" (sometimes referred to hereinafter as the pronouns provision).

---

[1]  This opinion uses the acronym "LGBT" in referring to persons protected under the challenged statute because that is the term the Legislature used. See also *post*, footnote 3.

Before the pronouns provision went into effect, Taking Offense (plaintiff), which describes itself as an entity dedicated to opposing efforts "to coerce society to accept [the] transgender fiction that a person can be whatever sex/gender s/he thinks s/he is, or chooses to be," filed a petition for a writ of mandate in the superior court seeking to block enforcement of the pronouns provision as facially unconstitutional under the First Amendment to the United States Constitution. After the trial court denied the petition, the Court of Appeal reversed in part, holding that the challenged provision violates the First Amendment because it is insufficiently tailored to address the state's interest in eliminating discrimination, and hence is facially unconstitutional. (*Taking Offense v. State of California* (2021) 66 Cal.App.5th 696, 702–703, 718–721 (*Taking Offense*).)

In this court, defendant the State of California (the State) asserted for the first time that plaintiff lacks capacity to sue *state* officers or entities under the "taxpayer standing" doctrine articulated in Code of Civil Procedure section 526a.[2] As explained below, we agree with the State that the present version of section 526a, as amended in 2018, does not allow standing to sue wholly state officers or entities. And yet, under the unusual circumstances of this case, and as we have done in analogous settings in the past, we also conclude that our interpretation of the statute does not impair our jurisdiction to rule on the merits of the claim before us.

On the merits, the State asserts that the pronouns provision survives plaintiff's challenge under the First Amendment. In addressing this question, we emphasize the

---

[2] Subsequent undesignated statutory references are to the Code of Civil Procedure.

narrow context in which the challenged statute operates. It seeks to protect long-term care residents' right to be free from discrimination in a setting in which they constitute a "captive audience" in what has become, in effect, each resident's home. The provision regulates conduct by staff persons whose job is to provide and support medical treatment and intimate personal care — thereby seeking to promote an environment conducive to such treatment and care. It is carefully calibrated and does not restrict long-term care facilities' staff from expressing their views about gender to anyone (including a resident) in any otherwise lawful manner other than by misgendering[3] a resident — and even then, the prohibition is limited to willful, repeated, knowing acts done because of a legally protected characteristic. In light of this unique setting and scope, we conclude that the provision should be analyzed, and upheld, as a regulation of discriminatory conduct that incidentally affects speech. It should not be subject to First Amendment scrutiny as an abridgment of the freedom of speech. And even assuming the statute were subject to intermediate scrutiny, we find the provision easily satisfies that test.

Finally, we conclude that the possibility of enforcement by way of pre-existing criminal penalties for particularly egregious violations of the statute does not render the challenged pronouns provision facially unconstitutional. Accordingly, we reverse the appellate court's judgment.

---

[3] We sometimes employ the term "misgendering" as shorthand for "[w]illfully and repeatedly fail[ing] to use a resident's preferred name or pronouns after being clearly informed." (Health & Saf. Code, § 1439.51, subd. (a)(5).) Relatedly, we use the term "preferred pronouns" when quoting the statutory text. (*Ibid.*) See also *ante,* footnote 1.

## I. FACTS AND PROCEDURAL HISTORY

### A. The LGBT Long-Term Care Residents' Bill of Rights

Various long existing laws prohibit discrimination — including discrimination on the basis of gender identity and gender expression — in public accommodations and related residential settings. For example, the Unruh Civil Rights Act (Civ. Code, § 51 et seq.) bars "all business establishments of every kind whatsoever" (*id.*, § 51, subd. (b)) from discriminating on the basis of "sexual orientation" (*ibid.*) or "gender identity and gender expression" (*id.*, subd. (e)(6)). The California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.) prohibits "the owner of any housing accommodation" from engaging in discrimination or harassment on the basis of "gender, gender identity, gender expression, [or] sexual orientation." (*Id.*, § 12955, subd. (a).) Health and Safety Code section 1569.269, subdivision (b), enacted as part of the Resident's Bill of Rights (Stats. 2014, ch. 702, § 1), bars residential care facilities for the elderly from discriminating against a resident based on "actual or perceived sexual orientation, or actual or perceived gender identity."

In enacting the LGBT Long-Term Care Residents' Bill of Rights in 2017, the Legislature asserted that although these and related existing laws already prohibit such discrimination, their "promise . . . has not yet been fully actualized in long-term care facilities." (Stats. 2017, ch. 483, § 1, subd. (e).) The Legislature sought "to accelerate the process of freeing LGBT residents and patients from discrimination, both by specifying prohibited discriminatory acts in the long-term care setting and by providing additional information and remedies to ensure that

LGBT residents know their rights and have the means to vindicate them." (*Ibid*.)

In support of its enactment, the Legislature articulated various findings. It cited its own prior conclusions, expressed a decade earlier, concerning the challenges faced by LGBT seniors who need access to long-term health care services, yet because of " 'lifelong experiences of marginalization,' " " 'avoid accessing elder programs and services, even when their health, safety, and security depend on it.' " (Stats. 2017, ch. 483, § 1, subd. (a).) The Legislature found that such seniors often "must rely on others for necessary care and services," and "may no longer enjoy the privacy of having their own home or even their own room." (*Id*., subd. (b).) Moreover, the Legislature found a 2013 study of LGBT seniors in San Francisco disclosed that nearly 60 percent lived alone, "[m]any reported poor physical and mental health," and "as compared to seniors in San Francisco generally, LGBT seniors have a heightened need for care, but often lack family support networks available to non-LGBT seniors. Further, LGBT seniors' fear of accessing services is justified. Nearly one-half of the participants . . . reported experiencing discrimination in the prior 12 months because of their sexual orientation or gender identity." (*Id*., subd. (d).)

The Legislature cited a 2011 study relating that "43 percent of respondents reported personally witnessing or experiencing instances of mistreatment of LGBT seniors in a long-term care facility, including all of the following: *being refused admission or readmission, being abruptly discharged, verbal or physical harassment from staff, staff refusal to accept medical power of attorney from the resident's spouse or partner, discriminatory restrictions on visitation, and staff refusal to*

*refer to a transgender resident by his or her preferred name or pronoun.*" (Stats. 2017, ch. 483, § 1, subd. (c), italics added.)

The Legislature comprehensively addressed each of the above-italicized problems by adopting Health and Safety Code section 1439.51, subdivision (a), making it "unlawful for a long-term care facility or facility staff to take" various actions "wholly or partially on the basis of a person's actual or perceived sexual orientation, gender identity, gender expression, or human immunodeficiency virus (HIV) status." (*Ibid.*) The Legislature listed the unlawful conduct: "(1) Deny[ing] admission to a long-term care facility, transfer[ring] or refus[ing] to transfer a resident within a facility or to another facility, or discharg[ing] or evict[ing] a resident from a facility. [¶] (2) Deny[ing] a request by residents to share a room. [¶] (3) Where rooms are assigned by gender, assigning, reassigning, or refusing to assign a room to a transgender resident other than in accordance with the transgender resident's gender identity, unless at the transgender resident's request. [¶] (4) Prohibit[ing] a resident from using, or harass[ing] a resident who seeks to use or does use, a restroom available to other persons of the same gender identity, regardless of whether the resident is making a gender transition or appears to be gender-nonconforming. Harassment includes, but is not limited to, requiring a resident to show identity documents in order to gain entrance to a restroom available to other persons of the same gender identity. [¶] (5) *Willfully and repeatedly fail*[*ing*] *to use a resident's preferred name or pronouns after being clearly informed of the preferred name or pronouns.* [¶] (6) Deny[ing] a resident the right to wear or be dressed in clothing, accessories, or cosmetics that are

permitted for any other resident. . . .''   (Health & Saf. Code,
§ 1439.51, subd. (a)(1)–(6), italics added.)[4]

The enactment adopted two additional substantive
provisions.  Health and Safety Code section 1439.52 requires
long-term care facilities to maintain records of a resident's
"gender identity, correct name, as indicated by the resident, and
pronoun of each resident, as indicated by the resident."  Health
and Safety Code section 1439.53 addresses privacy.  Subdivision

---

[4]   Subdivision (a) continues, listing as additional proscribed
acts:  "(7)  Restrict[ing] a resident's right to associate with other
residents or with visitors, including the right to consensual
sexual relations, unless the restriction is uniformly applied to
all residents in a nondiscriminatory manner.  This section does
not preclude a facility from banning or restricting sexual
relations, as long as the ban or restriction is applied uniformly
and in a nondiscriminatory manner.  [¶]  (8) Deny[ing] or
restrict[ing] medical or nonmedical care that is appropriate to a
resident's organs and bodily needs, or provid[ing] medical or
nonmedical care in a manner that, to a similarly situated
reasonable person, unduly demeans the resident's dignity or
causes avoidable discomfort."  (Health & Saf. Code, § 1439.51,
subd. (a)(7) & (8).)

Subdivision (b) of the statute provides:  "This section shall
not apply to the extent that it is incompatible with any
professionally reasonable clinical judgment."  (Health & Saf.
Code, § 1439.51, subd. (b).)  Subdivision (c) of the statute
requires that each facility post a notice specifying that it does
not practice or permit " 'discrimination, including, but not
limited to, bullying, abuse, or harassment, on the basis of actual
or perceived sexual orientation, gender identity, gender
expression, or HIV status,' " and noting that any person may
" 'file a complaint with the Office of the State Long-Term Care
Ombudsman . . . if you believe that you have experienced this
kind of discrimination.' "   (Health & Saf. Code, § 1439.51,
subd. (c).)

(a) concerns medical information privacy. Subdivision (b) governs a resident's autonomy privacy when unclothed.

The LGBT Long-Term Care Residents' Bill of Rights did not establish a new enforcement mechanism. Instead, it enacted Health and Safety Code section 1439.54, which incorporates pre-existing enforcement provisions.[5] As explained *post*, part III.G., by virtue of this section, licensed entities and their staffs who violate any of the enactment's substantive provisions, including the challenged pronouns provision, are subject to the same administrative and civil — and, in egregious cases, criminal — penalties applicable to violations of myriad other duties imposed on long-term care facilities and their staffs.

### B. Petition for Writ of Mandate

Plaintiff describes itself as "an unincorporated association which includes at least one California citizen and taxpayer who has paid taxes to the state within the past year." Its stated mission is to oppose "the rising 'cancel culture' and all efforts of the Legislature, the courts or the private sector to silence public debate in opposition to the official, progressive nonbinary gender paradigm and transgenderism." In December 2017, before the enactment went into effect, plaintiff filed a petition for a writ of mandate in the superior court against the State. The petition asserted that the court "has jurisdiction over this action pursuant to Code of Civil Procedure [section] 1084 et seq.

---

[5] That section provides: "A violation of this chapter [2.45] shall be treated as a violation under Chapter 2 [governing 'Health Facilities'] (commencing with section 1250), Chapter 2.4 [governing 'Long-Term Health Facilities'] (commencing with section 1417), or Chapter 3.2 [governing 'Residential Care Facilities for the Elderly'] (commencing with section 1569)." (Health & Saf. Code, § 1439.54.)

and [section] 526a" because those statutes had been "construed by the courts of the State to include taxpayer and citizen actions against the State itself, its officials and agents." (Italics omitted.) The petition asserted that Health and Safety Code section 1439.51, subdivision (a)(5)'s pronouns provision is unconstitutional "[o]n its face" on numerous grounds, including due process of law, equal protection of the laws, freedom of speech and expression, prior restraint, and freedom of religion, conscience, and related rights. The petition sought "[j]udicial mandate, declarations and injunctive relief ordering" that the pronouns provision is unconstitutional and invalid in each respect.

### C. Proceedings in the Trial Court

The trial court's order resolving these facial challenges observed that plaintiff had filed a " 'taxpayer's suit' pursuant to . . . section 526a to prevent the waste of taxpayer f[u]nds to enforce" the targeted provisions of the enactment, and to "prevent state actors from enforcing" those provisions. The court focused on plaintiff's "conten[tion] that the law could be enforced by myriad local entities or District Attorneys," and granted its motion to add several state officers and entities as named respondents (the California Attorney General, State Department of Social Services, and State Department of Public Health). The court did not specifically address whether plaintiff had standing to bring its constitutional challenges, but proceeded to review and reject each of plaintiff's constitutional claims.

Regarding plaintiff's various First Amendment challenges, the trial court observed that although Health and Safety Code section 1439.51, subdivision (a)(5) governs both a

long-term health care resident's pronouns *and name*, plaintiff did not challenge the provision's "protections regarding use of the resident's preferred name." The court next disagreed with the State's assertion that the provision "regulates conduct to which speech is incidental" and hence "does not trigger heightened review under the First Amendment." Undertaking such heightened review, the court determined the pronouns provision to be an enforceable "content-neutral 'time, place, and manner' restriction on speech." The court found the provision to be "narrowly tailored to serve a significant state interest in preventing discrimination and harassment."

The trial court rejected plaintiff's assertion that the challenged provision impermissibly "deprives long-term care facility staff of the '*right to express offensive speech*'" (italics added), and characterized the provision as having no application "outside of work." It rebuffed plaintiff's assertion that the challenged provision "unconstitutionally compels and censors speech content, and imposes viewpoint discrimination."[6] The court denied plaintiff's request for a writ of mandate, and declaratory and injunctive relief.

## D. Proceedings in the Court of Appeal

The appellate court reversed. It rejected the argument that Health and Safety Code section 1439.51, subdivision (a)(5)'s pronouns provision is content neutral, and

---

[6] The court dismissed plaintiff's remaining arguments, finding the provision did not constitute a prior restraint, or violate "the right to freedom of thought, belief, and conscience, by demanding adherence to an ideology concerning sex and gender." The court also held that the provision did not violate the First Amendment's free exercise or establishment clauses.

instead found it to be content based. (*Taking Offense*, *supra*, 66 Cal.App.5th at pp. 709–712.) Moreover, the Court of Appeal held that the law is subject to, and does not survive, strict scrutiny. (*Id.* at pp. 712–721.) The court agreed with the trial court that a compelling state interest exists to eliminate discrimination in long-term care facilities (*id.* at p. 717), but held the challenged provision — whether enforced through civil or criminal penalties — is "overinclusive in that it restricts more speech than is necessary to achieve the government's compelling interest." (*Id.* at p. 720.) The court characterized the provision as "criminalizing occasional, off-hand, or isolated instances of misgendering, that need not occur in the resident's presence and need not have a harassing or discriminatory effect on the resident's treatment or access to care" — and concluded that doing so is not "necessary to advance" the Legislature's legitimate goals. (*Id.* at p. 721.)[7] The parties did not brief, and the Court of Appeal did not address, whether plaintiff has standing to pursue its claims. We granted the State's petition for review.

## II. STANDING

The State asserts plaintiff lacks standing to challenge the enactment. Although the State did not raise the standing issue until its petition for review in this court, "contentions based on a lack of standing involve jurisdictional challenges and may be raised at any time in the proceeding." (*Common Cause v. Board*

---

[7] The appellate court found it unnecessary to address plaintiff's other challenges to the provision. (*Taking Offense*, *supra*, 66 Cal.App.5th at p. 721 [noting plaintiff's various other arguments, disposing of some of them, and declining to address whether the provision is "a viewpoint-based restriction of speech, and is unconstitutionally vague and overbroad"].)

*of Supervisors* (1989) 49 Cal.3d 432, 438.)  The State argues that plaintiff lacks taxpayer standing under section 526a because that statute applies only to suits against *local* governmental entities and officers — and here, plaintiff has sued only the State and a *state* officer and entities.  The State further contends that section 526a occupies the field of suits by taxpayers, and that the common law taxpayer standing doctrine, under which suits against state officers and entities have been allowed, has ceased to exist.

Plaintiff, which has the burden to establish standing (*Kwikset Corp. v. Superior Court* (2011) 51 Cal.4th 310, 327), contends that it has standing under section 526a because, despite that provision's limiting words speaking of suing only *local* entities or officers, this court has judicially broadened the statute to also allow suits against the *state* and its officers and entities.  Plaintiff further argues that common law taxpayer standing continues to exist and is satisfied here.

As explained below, we agree with the State that section 526a, as amended in 2018, does not afford standing to sue the State or its officers or entities such as those in this case.  But under the particular circumstances of this case, our interpretation of section 526a does not impair our ability to address the Court of Appeal's analysis and judgment on the merits.  In view of this determination, we need not resolve the parties' dispute concerning whether the doctrine of common law taxpayer standing continues to exist.[8]  Yet, as explained below,

---

[8]   For the same reasons we find it unnecessary to resolve the parties' additional dispute concerning whether plaintiff has standing pursuant to the common law public interest doctrine.

we encourage the Legislature (possibly working with the Law Revision Commission) to comprehensively review both section 526a and existing common law authority, in order to harmonize and clarify the circumstances under which the *state* and its officers or entities may be subject to a taxpayer standing suit.

### A. Taxpayer Standing as Developed at Common Law

Beginning in the late 19th century, the common law doctrine of taxpayer standing, recognized in most jurisdictions including California, allowed taxpayers to file lawsuits to enjoin *local* governmental officers and entities from engaging in asserted waste or unlawful expenditure of public funds. (E.g., *Winn v. Shaw* (1891) 87 Cal. 631, 636 (*Winn*); see generally Comment, *Taxpayers' Suits: A Survey and Summary* (1960) 69 Yale L.J. 895, 898–890 (hereinafter Comment, *Taxpayers' Suits: A Survey*); Jaffe, *Standing to Secure Judicial Review: Public Actions* (1961) 74 Harv. L.Rev. 1265, 1269–1282.)

In *Winn*, a county board of supervisors was poised to purchase land without first publishing a notification of its intent to do so, as required by law. (*Winn*, *supra*, 87 Cal. at p. 636.) The plaintiff, a local taxpayer, successfully sued to enjoin the sale as illegal. On appeal to this court, we upheld both the plaintiff's standing to sue and the injunction. (*Ibid*.) Addressing standing, we wrote: "[A] tax-payer of a county has such an interest in the proper application of funds belonging to the county that he may maintain an action to prevent their withdrawal from the treasury in payment or satisfaction of

---

(See, e.g., *Save the Plastic Bag Coalition v. City of Manhattan Beach* (2011) 52 Cal.4th 155, 166.)

demands which have no validity against the county.  The weight of authority seems to be in harmony with this view." (*Ibid*.)[9]

### B. Enactment of Statutory Taxpayer Standing: Former Section 526a

The Legislature adopted section 526a in 1909, providing for a version of taxpayer standing as follows:  "An action to obtain a judgment, restraining and preventing any illegal expenditure of, waste of, or injury to, the estate, funds, or other property of a county, town, city or city and county of the state, may be maintained against any officer thereof, or any agent, or other person, acting in its behalf, either by a citizen resident therein, or by a corporation, who is assessed for and is liable to pay, or, within one year before the commencement of the action, has paid, a tax therein." (Former § 526a, added by Stats. 1909, ch. 348, § 1, p. 578.)  This language was operative in 2017, when

---

[9]    Numerous other early cases, before and after *Winn*, likewise simply noted the plaintiff's status as a taxpayer, and then proceeded to address claims on the merits.  (See, e.g., *Soule v. McKibben* (1856) 6 Cal. 142; *Mock v. City of Santa Rosa* (1899) 126 Cal. 330, 336; *McConoughey v. City of San Diego* (1900) 128 Cal. 366, 367.)  We subsequently articulated justiciability restrictions on common law taxpayer actions.  (See *Dunn v. Long Beach L. & W. Co.* (1896) 114 Cal. 605, 609; *Keith v. Hammel* (1915) 29 Cal.App. 131, 134–135; *Nickerson v. San Bernardino* (1918) 179 Cal. 518, 522–523 (*Nickerson*); *Schaefer v. Berinstein* (1956) 140 Cal.App.2d 278, 289; *Silver v. Watson* (1972) 26 Cal.App.3d 905, 909–910; *Gilbane Building Co. v. Superior Court* (2014) 223 Cal.App.4th 1527, 1532–1533.)  In addition to allowing common law taxpayer suits against local officers and entities, some of our early decisions, without analysis, allowed taxpayer standing against *state* governmental officers.  (See *Livermore v. Waite* (1894) 102 Cal. 113, 124; *Wheeler v. Herbert* (1907) 152 Cal. 224, 227–228.)

plaintiff filed the present litigation. (See Stats. 1967, ch. 706, § 1, p. 2080.)

As the language reflects, the statutory taxpayer standing provision differed from the common law taxpayer standing doctrine in three ways. The former statute's text focused on suits to restrain and prevent asserted illegal expenditure of public funds against *local* governmental officers and entities — and was silent concerning standing to sue *state* governmental officers and entities. Second, it limited such standing by a natural person to one who was a "citizen resident" of the defendant jurisdiction. (Former § 526a.) Third, it required that a qualified plaintiff be liable to pay, or have paid, "a tax therein" within one year before suing. (*Ibid.*; see generally *Thomas v. Joplin* (1910) 14 Cal.App. 662, 664–665 [apparently viewing the Legislature's codification as having occupied the field].)

## C. Continuing Development of the Common Law Taxpayer Standing Doctrine and Early Recognition of Former Section 526a

After the enactment of former section 526a, both the statutory and common law doctrines continued to develop.[10] Eventually, several appellate decisions construed former section 526a broadly to afford standing, allowing plaintiffs to assert

---

[10] See, e.g., *Clouse v. City of San Diego* (1911) 159 Cal. 434, 435, 438; *Osburn v. Stone* (1915) 170 Cal. 480, 482, 491; *Nickerson, supra,* 179 Cal. at pages 522–527; *Crowe v. Boyle* (1920) 184 Cal. 117, 152 (*Crowe*); *Mines v. Del Valle* (1927) 201 Cal. 273, 279 (*Mines*); *Warfield v. Anglo & London Paris Nat. Bk.* (1927) 202 Cal. 345, 347; *Pratt v. Security Trust & Savings Bk.* (1936) 15 Cal.App.2d 630, 636–638; see also *Silver v. City of Los Angeles* (1961) 57 Cal.2d 39, 41–42; *Gogerty v. Coachella Valley Junior College Dist.* (1962) 57 Cal.2d 727, 731.

claims concerning police abuse of authority (*Wirin v. Horrall* (1948) 85 Cal.App.2d 497, 504–505); to contest transfer of a city's funds (*Trickey v. City of Long Beach* (1951) 101 Cal.App.2d 871, 880–881); to challenge, as unconstitutional, implementation of a state statute (*Lundberg v. County of Alameda* (1956) 46 Cal.2d 644, 647); and to enjoin police surveillance by concealed microphones (*Wirin v. Parker* (1957) 48 Cal.2d 890, 891 (*Parker*)).

Meanwhile, Court of Appeal decisions continued delineating the *common law* taxpayer standing doctrine, holding expressly that the common law permits suits against *state*, and not only against local, governmental officers and entities. In *Ahlgren v. Carr* (1962) 209 Cal.App.2d 248 (*Ahlgren*), a taxpayer plaintiff asserted common law standing to enjoin actions of state officers — the director of finance and state controller — from making allegedly illegal expenditures concerning textbooks for schools. (*Id.* at p. 250.) Addressing that issue for the first time, and without discussing or citing former section 526a, the appellate court in *Ahlgren* noted that, nationally, "the great weight of authority suggests the rule that the taxpayer does have such right." (*Ahlgren*, at p. 252.)

Similarly, in *California State Employees' Assn. v. Williams* (1970) 7 Cal.App.3d 390, 395 (*Williams*), the Court of Appeal found that the plaintiffs had common law standing to sue a state officer and pursue their claim that a contract concerning the Medi-Cal program violated the civil service provision of the California Constitution. Citing *Ahlgren* — and without mentioning former section 526a — the appellate court held that the "[p]laintiff taxpayers have standing to maintain an equity suit to enjoin allegedly illegal expenditures" by the state controller. (*Williams*, at p. 395.)

### D. Our Decisions Construing Former Section 526a as Allowing Suit Against the State

In the wake of these appellate decisions concluding that the *common law* taxpayer standing doctrine permits suits against state officers, in a series of four cases starting with *Blair v. Pitchess* (1971) 5 Cal.3d 258 (*Blair*), we construed *former section 526a* to allow suit to restrain and prevent asserted illegal expenditure of public funds against not only local officers, but also against state officers.

In *Blair*, *supra*, 5 Cal.3d 258, we considered a constitutional challenge to the "claim and delivery process," under which a " 'plaintiff in an action to recover the possession of personal property may, at the time of issuing the summons, or at any time before answer' require the sheriff, constable or marshal of a county to take the property from the defendant." (*Id.* at pp. 266, 265.) The plaintiffs were residents and taxpayers of the County of Los Angeles who had paid a real property tax to the county. (*Id.* at p. 265.) They sued the county, the sheriff, and other county officers (but not the state or its officers), seeking "an injunction restraining defendants from executing the provisions of the claim and delivery law," which assertedly violated provisions of the federal and state Constitutions. (*Ibid.*) The trial court granted the plaintiffs' motion for summary judgment, and enjoined the defendants and their employees as the plaintiffs requested. (*Id.* at p. 267.)

The defendants argued on appeal that the "plaintiffs had no standing to maintain the action and that consequently the trial court's judgment was advisory in nature." (*Blair*, *supra*, 5 Cal.3d at p. 267.) We responded: "[P]laintiffs bring their suit under section 526a, which authorizes actions by a resident taxpayer against officers of a county, town, city, or city and

county to obtain an injunction restraining and preventing the illegal expenditure of public funds. The primary purpose of this statute, originally enacted in 1909, is to 'enable a large body of the citizenry to challenge governmental action which would otherwise go unchallenged in the courts because of the standing requirement.' " (*Id.* at pp. 267–268, fn. omitted, citing Comment, *Taxpayers' Suits: A Survey*, *supra*, 69 Yale L.J. at p. 904.)

Our analysis in *Blair* then relied on cases cited earlier in this opinion, including *Parker*, *supra*, 48 Cal.2d 890, and *Mines*, *supra*, 201 Cal. 273, to support the proposition that "California courts have consistently construed section 526a liberally to achieve this remedial purpose." (*Blair*, *supra*, 5 Cal.3d at p. 268.) Next, we quoted our statement in *Crowe*, *supra*, 184 Cal. at page 152: " 'In this state we have been very liberal in the application of the rule permitting taxpayers to bring a suit to prevent the illegal conduct of city officials . . . .' " (*Blair*, at p. 268.) *Blair*'s next paragraph elaborated, in dictum: "Moreover, we have not limited suits under section 526a to challenges of policies or ordinances adopted by the county, city or town. . . . *Indeed, it has been held that taxpayers may sue state officials to enjoin such officials from illegally expending state funds.* ([*Ahlgren*, *supra*,] 209 Cal.App.2d 248, 252–254 . . . ; [*Williams*, *supra*,] 7 Cal.App.3d 390, 395 . . . .)" (*Blair*, at p. 268, italics added.)

To the extent the italicized passage has been understood as an authoritative interpretation of former section 526a, it is problematic dictum. As shown earlier, both *Ahlgren*, *supra*, 209 Cal.App.2d 248, and *Williams*, *supra*, 7 Cal.App.3d 390, involved *common law* taxpayer suits against state defendants, and *Ahlgren* took pains to highlight and discuss the propriety of

such suits.  Neither decision can be construed as contemplating, let alone applying, former section 526a — a statute that neither decision cited, and which by its terms allows taxpayer suits against only local entities or officers.

After reciting this dictum (as noted, the defendants in *Blair* were not state officers), we reasonably held that former section 526a applied and afforded taxpayer standing to sue the county officers in that case.  (*Blair, supra,* 5 Cal.3d at pp. 268–269.)  We proceeded to address the merits, holding the claim and delivery law unconstitutional, and affirmed the trial court's judgment.  (*Id.* at pp. 270–286.)

Perhaps our couched phrasing of the dictum in *Blair, supra,* 5 Cal.3d at page 268 ("it has been held that") was intended to implicitly refer to, without mentioning, the common law taxpayer standing doctrine, and to avoid the implication that we were speaking of cases interpreting former section 526a.  Yet as shown below, that is not how this passage from *Blair* has been understood in subsequent decisions by this court and our appellate courts.  Instead, our dictum in *Blair* has been construed as an interpretation of former section 526a, and as reading into that statute a right of taxpayers to sue *state* officers and entities to restrain and prevent asserted illegal expenditure of public funds.

Our first step toward confirming such an expansive reading of the former statute came just two months later, in *Serrano v. Priest* (1971) 5 Cal.3d 584 (*Serrano*), a suit in which the local / state distinction mattered because the action named as defendants both county officers *and* a state treasurer.  In our decision finding a constitutional violation concerning the public-school financing system, we addressed as a threshold matter the

plaintiffs' standing to sue under former section 526a. We stated in a footnote: "Although plaintiff parents bring this action against state, as well as county officials, *it has been held that state officers too may be sued under section 526a.* ([*Blair, supra,* 5 Cal.3d] at p. 267 . . . ; [*Williams, supra,*] 7 Cal.App.3d 390, 395 . . . ; [*Ahlgren, supra,*] 209 Cal.App.2d 248, 252–254 . . . .)" (*Serrano,* at p. 618, fn. 38.)

A few years later, we further affirmed this reading of *Blair*'s dictum in *Adams v. Department of Motor Vehicles* (1974) 11 Cal.3d 146. *Adams* was a taxpayer suit against a state entity, the Department of Motor Vehicles, and related state officers, challenging the constitutionality of the "garageman's labor and materials lien" statutes, which permitted involuntary sale and transfer of a vehicle without affording the owner a hearing. (*Id.* at pp. 149–150.) Briefly addressing standing, we held the suit proper under former section 526a, citing as sole authority the passage in *Blair, supra,* 5 Cal.3d at page 268, highlighted earlier. (*Adams,* at p. 151 & fn. 10.) Turning to the merits, we held the provision violated constitutional due process protections. (*Id.* at p. 157.)

Finally, in *Stanson v. Mott* (1976) 17 Cal.3d 206, we addressed a "taxpayer suit" (*id.* at p. 209) challenging expenditures by the defendant, the director of the state's Department of Parks and Recreation, asserting he illegally expended public funds to promote passage of a bond issue that was presented to the statewide voters. (*Ibid.*) On the merits, we held for the plaintiff. (*Id.* at pp. 213–223.) At the conclusion of that discussion, we briefly addressed the plaintiff's standing and entitlement to declaratory or injunctive relief. (*Id.* at pp. 222–223.) In this regard we cited, simply, both *Ahlgren, supra,* 209 Cal.App.2d at pages 252–254 (which, as observed

earlier, addressed common law taxpayer standing), *and* former section 526a. (*Stanson*, at p. 223.) As a contemporaneous commentator observed, in light of our decisions in *Blair*, *Serrano*, *Adams*, and then *Stanson*: "[O]ne might conclude that the court now reads the term 'state' into the list of public entities whose officers may be sued under the section." (Mains, *California Taxpayers' Suits: Suing State Officers Under Section 526a of the Code of Civil Procedure* (1976) 28 Hastings L.J. 477, 493.)

Indeed, that is how our Courts of Appeal have understood *Blair* and its progeny, in decisions allowing suits under the former statute. (See, e.g., *Duskin v. San Francisco Redevelopment Agency* (1973) 31 Cal.App.3d 769, 773 [observing that pursuant to *Blair*, "state officials too may be sued under" the statute]; *Los Altos Property Owners Assn. v. Hutcheon* (1977) 69 Cal.App.3d 22, 30 (*Los Altos*); *Central Valley Chap. 7th Step Foundation v. Younger* (1979) 95 Cal.App.3d 212, 232 [finding standing under the statute to sue a state official for unlawfully disseminating criminal offender record information]; *Vasquez v. State of California* (2003) 105 Cal.App.4th 849, 854 (*Vasquez*) [" '[A]lthough by its terms the statute applies to local governments, it has been judicially extended to all state and local agencies and officials' "]; *Cates v. California Gambling Control Com.* (2007) 154 Cal.App.4th 1302, 1308 [the statute allows "[a] taxpayer [to] sue to enjoin wasteful expenditures by state agencies as well as local governmental bodies"]; see also *Grosz v. California Dept. of Tax and Fee Admin.* (2023) 87 Cal.App.5th 428, 439 [following *Vasquez*].) Meanwhile, other appellate courts, relying on a combination of the former statute, our decision in *Blair*, and the common law decision in *Ahlgren*, found standing to sue the state to restrain and prevent asserted

illegal expenditure of public funds. (See, e.g., *Farley v. Cory* (1978) 78 Cal.App.3d 583, 589 & fn. 5; *California Assn. for Safety Education v. Brown* (1994) 30 Cal.App.4th 1264, 1281.)

To this day, courts have continued to apply an amalgam of both the common law and section 526a statutory standing principles in considering the standing of plaintiffs to sue governmental entities. Various decisions have acknowledged such dual bases, yet determined neither to be established, often also finding the underlying claim to be not justiciable. (*Torres v. City of Yorba Linda* (1993) 13 Cal.App.4th 1035, 1046–1048; *San Bernardino County v. Superior Court* (2015) 239 Cal.App.4th 679, 686; *San Diegans for Open Government v. Fonseca* (2021) 64 Cal.App.5th 426, 438, fn. 6; *Chodosh v. Commission on Judicial Performance* (2022) 81 Cal.App.5th 248, 268.) Other decisions have found taxpayer standing under both the statute and common law. (*California Taxpayers Action Network v. Taber Construction, Inc.* (2017) 12 Cal.App.5th 115, 141 (*California Taxpayers*); *California DUI Lawyers Assn. v. Department of Motor Vehicles* (2018) 20 Cal.App.5th 1247, 1259–1264 (*California DUI Lawyers*); *Raju v. Superior Court* (2023) 92 Cal.App.5th 1222, 1232, 1244–1246, review granted Sept. 13, 2023, S281001 (*Raju*).)

### E. The Legislature's 2018 Amendment of Section 526a To Provide That the Statute Authorizes Suits Against Those Acting on Behalf of a "Local Agency"

The Legislature amended section 526a in 2018, in response to our decision in *Weatherford v. City of San Rafael* (2017) 2 Cal.5th 1241 (*Weatherford*), which addressed the type of tax that affords standing under the statute. In that case, the plaintiff sued a city and county, asserting that their vehicle

impoundment enforcement practices violated state and federal constitutional guarantees, and sought to restrain and prevent related asserted illegal expenditure of public funds. (*Id.* at p. 1245.) The plaintiff acknowledged that she "had not been personally subject to this allegedly unconstitutional practice," but nevertheless claimed "she had taxpayer standing under section 526a." (*Ibid.*)

We granted review to address a question of statutory interpretation: Whether former section 526a "require[d] the payment of a *property tax* and — if the payment of a property tax [was] not required — what types of tax payments satisf[ied] the statute." (*Weatherford*, *supra*, 2 Cal.5th at p. 1245, italics added.) We held that a property tax payment suffices for standing under former section 526a, but was not required, and that "it [was] sufficient for a plaintiff to allege she or he has paid, or is liable to pay, to the defendant locality a tax assessed on the plaintiff by the defendant locality." (*Weatherford*, at p. 1252.) Chief Justice Cantil-Sakauye's concurring opinion encouraged the Legislature to "amend [section 526a] in a manner that makes clear what kinds of taxes are sufficient to establish standing to sue a particular government entity for alleged wasteful or illegal expenditures." (*Id.* at p. 1253 (conc. opn. of Cantil-Sakauye, C. J.).)

The Legislature did exactly that. (Stats. 2018, ch. 319, § 1.) Amended section 526a now lists the types of taxes that support standing. (§ 526a, subd. (a) [including, for example, sales taxes].) It also eliminates the words "county, town, city or city and county of the state," and replaces them with the term "local agency." (*Ibid.*) Finally, the amended statute sets forth, in subdivision (d), various definitions. Among them, it specifies: " 'Local agency' means a city, town, county, or city and county,

or a district, public authority, or any other political subdivision in the state." (§ 526a, subd. (d).)

### F. Amended Section 526a, by Its Terms, Does Not Afford Standing to Sue the State or Its Officers and Entities

Our decisions enlarging former section 526a to permit suit against state officers and entities have been criticized for "expand[ing] the [statutory] right to bring a taxpayer action to include suit against *state* government" "without any real analysis of either the statute's legislative history or express terms." (*Cornelius v. Los Angeles County etc. Authority* (1996) 49 Cal.App.4th 1761, 1775–1776.) Likewise, respected commentators have characterized those prior decisions as blurring distinctions between the statutory and common law doctrines, and as confusing, unsupported, and poorly defined.[11] We find these critiques of our judicial interpretation of the former statute well taken. So, apparently, have some Court of Appeal decisions that have questioned the analysis in *Blair* and

---

[11] Asimow et al., California Practice Guide: Administrative Law (The Rutter Group 2022) paragraph 14:254, page 14-40, bluntly observes that the authority we cited to support our standing holding in *Serrano*, *supra*, 5 Cal.3d at page 618, footnote 38, "*does not support it.*" (Italics added.) Moreover, the authors conclude, "the relationship between [section] 526a and common law taxpayer actions is confusing and poorly defined." (Asimow et al., Administrative Law, *supra*, ¶ 14:250, at p. 14-39.) Likewise, 4 Witkin, California Procedure (6th ed. 2021) Pleading, section 167, at page 225 observes that numerous decisions of this court and the Courts of Appeal, both before and after the 2018 revisions to section 526a, have "extended the scope of [section] 526a to allow actions against state agencies and officials, sometimes blurring the line between common law and statutory taxpayers' actions."

its progeny. (See, e.g., *Los Altos*, *supra*, 69 Cal.App.3d at p. 28 [observing that "[t]he precise language of section 526a appears to limit its application to actions against officers of a county, town, city, or city and county of the state," and yet "language contained in various Supreme Court decisions declares that the statute is not so restricted in its application"]; accord, *Vasquez*, *supra*, 105 Cal.App.4th at p. 854.) This absence of clarity has understandably led subsequent appellate decisions addressing suits against the state to employ an amalgam of statutory and common law principles to find standing to sue such officers and entities. (See, e.g., *California Taxpayers*, *supra*, 12 Cal.App.5th at p. 141; *California DUI Lawyers*, *supra*, 20 Cal.App.5th at pp. 1259–1264; *Raju*, *supra*, 92 Cal.App.5th at pp. 1244–1246, rev. granted.)

We discern no textual support for our initial judicial expansion of former section 526a to allow for suit against state officers and entities. As alluded to earlier, our prior decisions applied common law principles to support that expansion without providing reasoned explanation for doing so, thus sowing confusion by melding aspects of the statutory and common law taxpayer standing doctrines. Now, the Legislature has amended section 526a to eliminate the words "county, town, city or city and county of the state," to replace that phrase with "local agency," and to define *that* term as "a city, town, county, or city and county, or a district, public authority, or any other political subdivision in the state." (*Id*., subd. (d)(1), as amended by Stats. 2018, ch. 319, § 1.) By this amendment, the Legislature has made it clear that the statute confers standing to sue only *local*, and not *state* governmental officers and

entities.[12]  Accordingly, we hold that section 526a, as amended in 2018, does not afford standing to sue state entities or officials to restrain and prevent asserted illegal expenditure of public funds.

### G. We Exercise Our Discretion To Address the Court of Appeal's Analysis and Judgment

Based on its contention that plaintiff lacks standing, the State urges us to vacate the Court of Appeal's decision, without reviewing the merits of the court's conclusion that the provision is facially unconstitutional.

As we have observed, standing is jurisdictional and "must exist at all times until judgment is entered and not just on the date the complaint is filed." (*Californians for Disability Rights v. Mervyn's, LLC* (2006) 39 Cal.4th 223, 233.)  Yet in light of the highly unusual posture and circumstances of the present case, were we to conclude that we lack jurisdiction to address the Court of Appeal's analysis and judgment invalidating the

---

[12]  As shown earlier, the history of the 2018 amendment reveals that the Legislature intended to clarify the law concerning standing to sue *local* entities under the statute.  At the same time, however, the same history reflects no indication that the Legislature focused on the fact that the former statute had long previously been judicially interpreted to permit suits against state officers or entities — that is, officers such as the Governor, and various state entities such as the Department of Motor Vehicles.  If the Legislature had focused on and desired to maintain the prior broad interpretation of former section 526a, it seems unlikely that it would have specified that the statute authorizes suits against those representing a "local agency," and provided a specific definition of "local agency" that implicitly excludes the state — while at the same time failing to *affirm* that a state officer or entity may be sued under the statute.

challenged provision for assertedly restricting more speech than necessary to achieve the state's compelling interest, a cloud over the constitutionality of the statute — a significant matter of public interest — would continue to loom. Such a determination, unaccompanied by any ruling on the merits by this court explaining why the Court of Appeal below erred when announcing its reason for invalidating the challenged provision on its face, would impair the administration of justice, leaving the State uncertain whether it is free to enforce the statute, and those who view the statute as unconstitutional but wish to engage in conduct that violates it would be uncertain whether they are free to do so.

In light of these extraordinary circumstances, and mindful of our own prior decisions interpreting the predecessor statute to afford standing to sue the state, and also in view of the fact that the parties have thoroughly litigated the merits in the courts below and in their briefs in this court, we exercise this court's discretion to proceed to the merits as addressed in the Court of Appeal's judgment. (Cal. Const., art. VI, § 12, subd. (b); cf. *Dix v. Superior Court* (1991) 53 Cal.3d 442, 454 & fn. 8 [exercising discretion to consider the merits of a petitioner's claims notwithstanding the absence of standing].) In *Dix*, we concluded both that the "Court of Appeal erred in ruling that petitioner has standing to challenge the recall of [a specific inmate's] sentence," and acknowledged that "[n]othing more [was] necessary to our holding that the judgment must be reversed with directions to dismiss the mandamus action." (*Id.* at p. 454.) Nevertheless, "we deem[ed] it appropriate to address petitioner's sentencing arguments for the guidance of the lower courts," and exercised our discretion to do so. (*Ibid.*)

Having so concluded, we do not address whether plaintiff has "public interest" standing (see *ante*, fn. 8), or whether the common law taxpayer standing doctrine continues to exist, and whether, if it does, such standing is satisfied in this case. We instead defer such issues for consideration in any potential future litigation. In the meantime, the Legislature, perhaps working with the Law Revision Commission, is encouraged to survey the field described in the cases cited earlier, and consider whether it is appropriate to limit or eliminate the common law doctrine, or perhaps merge a version of it into a further revised version of section 526a, as it deems warranted.

## III. PLAINTIFF'S FACIAL CONSTITUTIONAL CHALLENGES TO THE PRONOUNS PROVISION

Plaintiff challenges the pronouns provision on its face under the United States Constitution's First Amendment, which prohibits enforcement of laws "abridging the freedom of speech." (U.S. Const., 1st Amend.)

### A. Presumption of Constitutionality — and Why Facial Challenges Are Disfavored

As the Court of Appeal recognized, and as our prior cases have held, there is a strong presumption that an act of the Legislature is constitutional. (*Taking Offense*, *supra*, 66 Cal.App.5th at p. 705.) " ' "[M]ere doubt by the judicial branch . . . as to the validity of a statute will not afford a sufficient reason for a judicial declaration of its invalidity[. Instead,] . . . statutes must be upheld as constitutional unless their invalidity *clearly, positively, and unmistakably appears*." [Citation.] These principles govern a challenge to the facial validity of a statute.' " (*Ibid.*)

A corollary principle is relevant here:  As a general matter, "[f]acial challenges are disfavored for several reasons." (*Washington State Grange v. Washington State Republican Party* (2008) 552 U.S. 442, 450.)  They "often rest on speculation," and hence "raise the risk of 'premature interpretation of statutes on the basis of factually barebones records.' " (*Ibid*.)  "Facial challenges also run contrary to the fundamental principle of judicial restraint that courts should neither ' "anticipate a question of constitutional law in advance of the necessity of deciding it" ' nor ' "formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied." ' " (*Ibid*.)  "Finally, facial challenges threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution.  We must keep in mind that ' "[a] ruling of unconstitutionality frustrates the intent of the elected representatives of the people." ' " (*Id*. at p. 451; accord, *Moody v. Netchoice, LLC* (2024) 603 U.S. 707, 723 [free speech challenge].)

## B.  Standard for Assessing Facial Challenges

"We evaluate the merits of a facial challenge by considering 'only the text of the measure itself, not its application to the particular circumstances of an individual.' " (*Zuckerman v. State Bd. of Chiropractic Examiners* (2002) 29 Cal.4th 32, 38–39.)  "A litigant mounting a facial challenge bears a formidable burden to demonstrate . . . invalidity in 'at least " 'the generality' " [citation] or "vast majority" ' of cases." (*People v. Martinez* (2023) 15 Cal.5th 326, 352 (*Martinez*).) "This is an 'exacting' standard." (*Ibid*.)  As explained below, plaintiff has not carried this heavy burden.

### C. The High Court's Decision in *Reed*

In reaching its contrary conclusion, the Court of Appeal below relied heavily on *Reed v. Town of Gilbert* (2015) 576 U.S. 155 (*Reed*), in which the high court considered a municipality's regulation that treated in different fashion various categories of outdoor signs based on the type of information each sign conveyed.  The law subjected temporary signs directing the public to a meeting to more stringent restrictions than other signed messages.  (*Id*. at pp. 159–161.)  A religious group that lacked a permanent location, and wished to post signs showing its Sunday services and locations, challenged the regulation as a content-based abridgment of First Amendment rights.  (*Id*. at p. 162.)  The trial court rejected the challenge and the appellate court affirmed, finding the law content neutral, and upholding it under intermediate scrutiny.  (*Id*. at pp. 162–163.)

The high court reversed.  The court found the town's sign law to be "content based on its face."  (*Reed*, *supra*, 576 U.S. at p. 164.)  The court held that such laws, which "target speech based on its communicative content," "are presumptively unconstitutional and may be justified only" if they survive *strict scrutiny* analysis, that is, "if the government proves that they are narrowly tailored to serve compelling state interests."  (*Id*. at p. 163; see *Martinez*, *supra*, 15 Cal.5th at p. 342 [noting that under *Reed*, "[a]s a general rule," the high court has held that noncommercial content-based restrictions " 'are presumptively unconstitutional' "].)

The Court of Appeal below concluded that *Reed* required it to apply strict scrutiny in this case.  (*Taking Offense*, *supra*, 66 Cal.App.5th at pp. 712–716.)  The State disagrees.  It argues that despite the high court's language in *Reed*, *supra*, 576 U.S.

at page 163, a standard of review "less exacting" than strict scrutiny — a form of intermediate scrutiny " 'analogous to . . . time, place and manner' " analysis — is appropriate when, as here, "a statute shields an 'unwilling and captive audience' from verbal discrimination."

Somewhat similarly, amici curiae California Professors of Freedom of Expression and Equality Law also argue that strict scrutiny is inapplicable here. They observe that *Reed* concerned speech occurring in a traditional public forum, where information implicating the marketplace of ideas is most strongly protected. Distinguishing such a setting from the present one, the professors urge that "*Reed*'s holding does not extend to all contexts in which words are voiced — to courts and care facilities no less than streets and sidewalks." They assert that the challenged pronouns provision does not regulate public discourse, but only "verbal conduct outside the marketplace of ideas, in a place — at once a workplace, a public accommodation, a medical care facility, and a place of residence — where LGBT seniors are a uniquely captive audience." Yet, they argue, even if the statute is viewed as reaching "a mix of protected speech and unprotected speech or conduct, strict scrutiny would *still* be the wrong framework to employ. Instead, an overbreadth analysis would then be required."

Finally, and relatedly, amici curiae Lambda Legal Defense and Education Fund, National Center for Lesbian Rights, ACLU of Southern California, et al. urge us to view the challenged statute not as a content-based regulation of protected speech, but instead as a regulation of discriminatory "*conduct*, which triggers no special constitutional scrutiny." (Italics added.) At oral argument, the State endorsed a version of this approach.

As explained *post*, part III.D., we conclude that an analysis akin to that last described — one that evaluates restrictions on discriminatory conduct — is appropriate in this setting, and the challenged pronouns provision should be upheld under that approach. Finally, as explained *post*, part III.G., we conclude that the circumstance that enforcement may, in some rare and extreme circumstances, possibly trigger potential criminal penalties, does not call for invalidation of the challenged pronouns provision in this facial challenge.

## D. Section 1439.51, Subdivision (a)(5) Constitutionally Prohibits Discriminatory Conduct in Long-term Care Facilities

As observed earlier, the Court of Appeal agreed with plaintiff that pursuant to the high court's decision in *Reed*, *supra*, 576 U.S. 155, Health and Safety Code section 1439.51, subdivision (a)(5) is subject to strict scrutiny analysis under the First Amendment, and that it fails. We conclude that *Reed* and its First Amendment strict scrutiny analysis does not apply here.

The challenged statute addresses and operates in a narrow setting. It properly regulates *discriminatory conduct* aimed at vulnerable seniors who typically constitute a captive audience, residing in long-term care facilities that have become, in effect, their homes. The provision regulates the professional conduct of long-term care staff whose job is to provide and support medical treatment and intimate personal care — and seeks to promote an environment conducive to such care. It is carefully calibrated to achieve those ends, and does not preclude facility staff from expressing their views about gender to anyone (including a resident) in any otherwise lawful manner other than by misgendering a resident — and even then, the

prohibition is limited to willful, repeated, knowing acts done because of a protected characteristic.

In this setting, and pursuant to relevant authority discussed below governing public accommodations and anti-discrimination laws that prohibit acts that create hostile environments while only incidentally affecting speech, we conclude the First Amendment presents no obstacle. As we explain, the challenged pronouns provision regulates speech only indirectly, by prohibiting, analogously to Title VII,[13] conduct that amounts to harassment or discrimination.

    1. *Relevant case law*

        a. *The high court's decision in* R. A. V. — *establishing that laws regulating conduct may constitutionally prohibit discriminatory and incidental speech*

In *R. A. V. v. St. Paul* (1992) 505 U.S. 377 (*R. A. V.*), the United States Supreme Court considered a First Amendment challenge to a city's bias-motivated crime ordinance, which prohibited the display of a burning cross or other symbol that an individual " 'knows or has reasonable grounds to know arouses anger, alarm or resentment in others on the basis of race, color, creed, religion or gender.' " (*R. A. V.*, at p. 380.) The state supreme court had construed the statute to reach only fighting words and had further concluded that it was not overbroad and withstood strict scrutiny. (*Id.* at pp. 380–381.) The high court reversed, finding that the statute was a content-based regulation that failed strict scrutiny. (*Id.* at pp. 395–396.) Significantly for our purposes, in doing so the court articulated

_____

[13] Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.; Title VII).

an important caveat: Laws regulating conduct may constitutionally prohibit discriminatory speech, despite according "differential treatment to . . . a content-defined subclass" of speech. (*Id.* at p. 389.)

The high court explained that the First Amendment's "prohibition against content discrimination . . . is not absolute." (*R. A. V.*, *supra*, 505 U.S. at p. 387.)[14] The Court analogized to "Title VII's general prohibition against sexual discrimination in employment practices, 42 U.S.C. § 2000e-2" as an example of a statute that permissibly targets conduct, rather than speech. (*R. A. V.*, at p. 389.) The *R. A. V.* court observed that "sexually derogatory 'fighting words,' among other words, may produce a violation of Title VII's general prohibition against sexual discrimination in employment practices." (*Ibid.*)[15]

---

[14] One exception the court recognized as a "valid basis for according differential treatment to even a content-defined subclass of proscribable speech" applies when "the subclass happens to be associated with particular 'secondary effects' of the speech, so that the regulation is 'justified without reference to the content of the . . . speech.' " (*R. A. V.*, *supra*, 505 U.S. at p. 389, italics omitted.) The court observed that because "words can in some circumstances violate laws directed not against speech but against conduct . . . , a particular content-based subcategory of a proscribable class of speech can be swept up incidentally within the reach of a statute directed at conduct rather than speech." (*Ibid.*)

[15] The court declined, however, to view discriminatory speech as categorically immune from First Amendment scrutiny. Indeed, the court concluded that in the matter before it, the statute was *not* one directed at conduct rather than speech. Instead, the court found, the statute at issue constituted "content discrimination" — and hence an unconstitutional abridgment of freedom of speech under the particular circumstances of that case. (*R. A. V.*, *supra*, 505 U.S. at p. 391.)

b. *Our plurality decision in* Aguilar — *viewing anti-discrimination laws as permissible regulations of conduct, rather than protected speech subject to First Amendment scrutiny, and upholding an injunction barring the use of racial epithets in a workplace*

In *Aguilar v. Avis Rent A Car System, Inc.* (1999) 21 Cal.4th 121 (*Aguilar*), a plurality of this court applied *R. A. V.* in rejecting a First Amendment challenge similar to the one plaintiff raises here. Pointing to the "statement in *R. A. V.* . . . that harassing speech that is sufficiently severe or pervasive to constitute employment discrimination is not constitutionally protected" (*Aguilar*, at p. 137 (plur. opn.)), the plurality upheld an injunction barring a manager who worked for Avis from continuing to violate the FEHA by using certain " 'derogatory racial or ethnic epithets' " (*Aguilar*, at p. 128 (plur. opn.)) to target the agency's Hispanic employees in the workplace. Our decision was announced in a plurality opinion by Chief Justice George (*id.* at pp. 126–147 (plur. opn.)) and a separate opinion by Justice Werdegar, who concurred in substantial part (*id.* at pp. 147–169 (conc. opn. of Werdegar, J.)).

The plurality opinion concluded that "the pervasive use of racial epithets that has been judicially determined to violate the FEHA is not protected by the First Amendment." (*Aguilar*, *supra*, 21 Cal.4th at pp. 141–142 (plur. opn. of George, C. J.); see also *id.* at p. 134 (plur. opn.) ["[a] statute that is otherwise valid, and is not aimed at protected expression, does not conflict with the First Amendment simply because the statute can be violated by the use of spoken words or other expressive activity"].) In relevant part, the plurality drew upon *R. A. V.*, *supra*, 505 U.S. 377, and related high court case law concerning Title VII employment discrimination, specifically, the hostile

environment context (*Harris v. Forklift Systems, Inc.* (1993) 510 U.S. 17 (*Harris*); *Meritor Savings Bank v. Vinson* (1986) 477 U.S. 57 (*Meritor*)), all of which had analyzed anti-discrimination laws as permissible regulations of discriminatory conduct, rather than protected speech amenable to First Amendment scrutiny. In light of these opinions, the plurality summarized: "[T]he United States Supreme Court has held that the use of racial epithets that is sufficiently severe or pervasive constitutes 'employment discrimination' in violation of Title VII [citations] and these decisions are at least implicitly inconsistent with any suggestion that speech of this nature is constitutionally protected." (*Aguilar*, at pp. 134–135 (plur. opn. of George, C. J.).) Indeed, the plurality concluded, these high court decisions make it "clear . . . that the First Amendment permits imposition of civil liability for past instances of pure speech that create a hostile work environment," and, as applied in the circumstances then before us, permit imposition of liability for "spoken words [that], either alone or in conjunction with conduct, amount to employment discrimination." (*Id.* at pp. 135, 134 (plur. opn.).) Accordingly, the plurality did not find First Amendment scrutiny to be appropriate. (*Aguilar*, at pp. 133–137 (plur. opn.).) Rather, it viewed the "sole issue in the present case [as] whether the First Amendment" allows not only "imposition of civil liability for past instances of pure speech that create a hostile work environment," but also "the issuance of an injunction to prohibit the continuation of such discriminatory actions." (*Id.* at p. 135 (plur. opn.).)

The plurality in *Aguilar* rejected the argument that the injunction constituted an impermissible prior restraint on speech, reasoning that "once a court has found that a specific pattern of speech is unlawful, an injunctive order prohibiting

the repetition, perpetuation, or continuation of that practice is not a prohibited 'prior restraint' of speech." (*Aguilar*, *supra*, 21 Cal.4th at p. 140 (plur. opn. of George, C. J.).) Because the injunction was "based upon a continuing course of repetitive speech that has been judicially determined to violate the FEHA," the plurality held that prohibiting the defendant and its manager "from continuing to violate the FEHA does not violate their First Amendment rights." (*Id*. at p. 141 (plur. opn.).)

Finally, in addressing a claim that the injunction was overbroad because it could apply "even outside the hearing of" the plaintiffs, the plurality again analogized to Title VII's hostile work environment framework. (*Aguilar*, *supra*, 21 Cal.4th at p. 145 (plur. opn. of George, C. J.).) Defendants had argued that "the use of racial epithets outside the hearing of Hispanic employees does not contribute to a hostile work environment if the audience does not find the speech unwelcome and the subjects of the racial invective are unaware they are being maligned." (*Ibid*.) The plurality responded that although the incomplete record prevented an outright ruling, it "is possible that the use of racial epithets even outside the hearing of plaintiffs would contribute to an atmosphere of racial hostility that would perpetuate the hostile work environment." (*Id*. at p. 146 (plur. opn.).)

The concurring opinion, unlike the plurality, subjected the injunction to First Amendment scrutiny. In its view, the "captive" nature of employees in the workplace, paired with alternative avenues for voicing discriminatory beliefs, rendered the prohibition akin to a content-neutral regulation. (*Aguilar*, *supra*, 21 Cal.4th at p. 159 (conc. opn. of Werdegar, J.).) The concurrence observed that "strong public policies governing the workplace — both private and public — may justify some

limitations on the free speech rights of employers and employees," and stressed "the reality that workplaces and jobsites are not usually thought of as marketplaces for the testing of political and social ideas." (*Id.* at pp. 158–159 (conc. opn. of Werdegar, J.).) The concurrence emphasized that the injunction protected employees who were not "reasonably free to walk away when confronted with . . . racial slurs" at work. (*Id.* at pp. 160–161 (conc. opn. of Werdegar, J.).) It also found that the employees' "status as forced recipients of [the defendant manager's] speech lends support to the conclusion that restrictions on [the manager's] speech are constitutionally permissible in the circumstances at hand, where the regulation of speech is limited solely to the workplace and the offended recipients constitute a captive audience." (*Id.* at p. 162 (conc. opn. of Werdegar, J.).) Because "ample alternatives for advocating, espousing or simply stating" discriminatory beliefs existed, the concurrence viewed the injunction as "analogous to a permissible time, place and manner restriction on speech." (*Id.* at pp. 164, 162 (conc. opn. of Werdegar, J.).)[16]

---

[16] The concurring opinion acknowledged that "[t]he Supreme Court's existing time, place and manner decisions admittedly do not wholly govern this case, for not only does this case not involve a public forum, the injunction here is not content-neutral." (*Aguilar*, *supra*, 21 Cal.4th at p. 164 (conc. opn. of Werdegar, J.).) The concurrence concluded, however, that "[w]hether the content-based nature of the injunction wholly disqualifies the time, place and manner doctrine from any application to this case need not be decided." (*Id.* at p. 165 (conc. opn. of Werdegar, J.).) It reasoned that when the components of that doctrine — "a compelling state interest and alternative channels of communication — are considered together with the facts [that] the speech sought to be enjoined occurred in the

### 2. *Strict scrutiny analysis does not apply to regulation of conduct in the anti-discrimination setting*

As shown above, anti-discrimination laws such as Title VII and the FEHA (and related public accommodation laws) permissibly regulate discriminatory *conduct* — and have not generally been subject to First Amendment scrutiny. For example, a prohibition on employment discrimination "will require an employer to take down a sign reading 'White Applicants Only,' " but this "hardly means that the law should be analyzed as one regulating the employer's speech rather than conduct." (*Rumsfeld v. Forum for Academic & Institutional Rights, Inc.* (2006) 547 U.S. 47, 62 (*Rumsfeld*).) That is so because " 'it has never been deemed an abridgment of freedom of speech . . . to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed.' " (*Ibid.*, quoting *Giboney v. Empire Storage & Ice Co.* (1949) 336 U.S. 490, 502.) Were it overwise, a "law against treason" could not restrict "telling the enemy the Nation's defense secrets" (*R. A. V.*, *supra*, 505 U.S. at p. 389); an "ordinance against outdoor fires" could not prohibit "burning a flag" (*id.* at p. 385); and antitrust laws would be helpless against " 'agreements in restraint of trade.' " (*Sorrell v. IMS Health Inc.* (2011) 564 U.S. 552, 567, quoting *Giboney*, at p. 502.)

In other words, the high court has clarified, "acts are not shielded from regulation merely because they express a

workplace and the recipients of the unwelcome speech were a captive audience, a strong case for upholding the injunction appears." (*Ibid.*)

discriminatory idea or philosophy." (*R. A. V.*, *supra*, 505 U.S. at p. 390.)

Thus, like the plurality in *Aguilar*, *supra*, 21 Cal.4th at pages 133–137, we reject the assertion that a law such as the one we consider here, aimed at discriminatory conduct, is subject to First Amendment scrutiny as an abridgment of freedom of speech. Health and Safety Code section 1439.51, subdivision (a)(5) targets discriminatory conduct by prohibiting acts that would create a hostile environment in a long-term care facility — thereby facilitating the ability of such residents to obtain long-term medical and related intimate personal care in an environment that is conducive to, and does not undermine, such care.

By contrast, the Court of Appeal below assumed that the challenged statute triggered First Amendment analysis — and indeed, strict scrutiny — because the prohibited conduct involves verbal communication. We disagree with the Court of Appeal's view. We acknowledge that the Legislature's clarification of discriminatory conduct prohibited by state anti-discrimination laws through enactment of the statute implicates spoken or written words by proscribing certain "[w]illful[] and repeated[]" acts of misgendering done on the basis of a legally protected characteristic. (Health & Saf. Code, § 1439.51, subd. (a)(5).)[17] Yet we interpret statutory provisions in context,

_____

[17]  In light of this statutory language, we reject the Court of Appeal's characterization of the challenged statute as impermissibly penalizing "occasional, isolated, off-hand instances of willful misgendering." (*Taking Offense*, *supra*, 66 Cal.App.5th at p. 720.) Moreover, the "common understanding" of the word " 'repeatedly' " is "more than one

not in isolation. (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1387 [provisions "relating to the same subject must be harmonized, both internally and with each other, to the extent possible"].) So viewed, the challenged regulation is simply one aspect of an overall legislative scheme directed at barring various forms of discriminatory conduct in the unique long-term care facility setting. As further explained *post*, part III.D.4.a., the regulation's placement in a long list of provisions that limit specific "actions" of "long-term care facility . . . staff" (Health & Saf. Code, § 1439.51, subd. (a)) reveals the Legislature's intent to address such related *conduct* by facility staff. The fact that one subpart of the statute can be violated by spoken words "hardly means that the law should be analyzed as one regulating [the employees'] speech rather than conduct." (*Rumsfeld, supra*, 547 U.S. at p. 62.)

As established earlier, under the high court's precedents, the regulation of discriminatory conduct does not trigger First Amendment scrutiny, even when such conduct is carried out through spoken or written expression. (*R. A. V., supra*, 505 U.S. at p. 389; *Meritor, supra*, 477 U.S. at p. 67.) These authorities demonstrate that in appropriate circumstances it is constitutionally permissible to proscribe acts that contribute to

---

time." (*People v. Heilman* (1994) 25 Cal.App.4th 391, 400; *People v. Ibarra* (2007) 156 Cal.App.4th 1174, 1197 [" 'More than once' is a dictionary definition of the word"].) But just as within the context of enforcing Title VII, or the federal Fair Housing Act (FHA; 42 U.S.C. §§ 3601–3619), or our state's FEHA, "[t]here is no 'magic number of instances' that must be endured before an environment becomes so hostile that the occupant's right . . . has been violated." (*Wetzel v. Glen St. Andrew Living Cmty., LLC* (7th Cir. 2018) 901 F.3d 856, 862 [federal FHA claim].)

the creation or perpetuation of a hostile workplace environment, even when those acts involve spoken or written communication.

More specifically, for the reasons outlined below, we conclude that Health and Safety Code section 1439.51, subdivision (a)(5)'s prohibition, in the context of long-term care facilities, of "[w]illfully and repeatedly fail[ing] to use a resident's preferred name or pronouns after being clearly informed of the preferred name or pronouns" constitutes a proper regulation analogous to Title VII's prohibition of a hostile work environment.[18] We need not analyze the boundaries of impermissible harassment and discrimination under the First Amendment because the challenged provision regulates conduct — that is, discriminatory "actions [taken] wholly or partially on the basis of a person's actual or perceived . . . gender identity . . . [or] gender expression" (Health & Saf. Code, § 1439.51, subd. (a))[19] — corresponding to Title VII's prohibition, and hence reflects the sphere of conduct that the high court has deemed constitutionally proscribable. Indeed, the proscription at issue arises not merely in the workplace, but simultaneously in a special residential setting in which those whom the statute seeks to protect are both particularly unlikely to be able to avoid the unwanted conduct and particularly in danger of being harmed by it.

---

[18] Because subdivision (a)(5) of Health and Safety Code section 1439.51 is the sole provision at issue in this litigation, we address only the proper reading of that subdivision. We take no position concerning the proper interpretation of other aspects of section 1439.51.

[19] We construe "on the basis of," as used in the statute, as synonymous with " 'because of.' " (Cf. *Franklin v. Gwinnett County Public Schools* (1992) 503 U.S. 60, 75.)

3. *Overview of hostile environment doctrine under existing anti-discrimination laws and related authority concerning workplaces, homes, and medical settings relevant in the long-term care setting*

Title VII bars discrimination in the "terms, conditions, or privileges of employment" (42 U.S.C. § 2000e-2(a)(1)) and creates a cause of action with respect to harassment that is "sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" (*Meritor, supra*, 477 U.S. at p. 67.) The statute reaches harassment that is (1) "severe or pervasive enough to create an objectively hostile or abusive work environment — an environment that a reasonable person would find hostile or abusive" (judged from the perspective of a reasonable person in the plaintiff's position), (2) when the victim "subjectively perceive[s] the environment to be abusive." (*Harris, supra*, 510 U.S. at p. 21; see also *Oncale v. Sundowner Offshore Services, Inc.* (1998) 523 U.S. 75, 81 (*Oncale*).)

"The working environment must be evaluated in light of the totality of the circumstances." (*Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 462, citing *Harris, supra*, 510 U.S. at p. 23.) As the high court has explained, "[t]he real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." (*Oncale, supra*, 523 U.S. at pp. 81–82.) Verbal or written communication alone can create a hostile workplace environment under Title VII. (See *Harris*, at pp. 20, 21 [reversing and remanding a district court decision holding that derogatory comments on the

basis of sex did not create an abusive environment because they were not " 'so severe as to be expected to seriously affect [the plaintiff's] psychological well-being' " and did not cause "tangible psychological injury"]; *Nichols v. Azteca Restaurant Enterprises, Inc.* (9th Cir. 2001) 256 F.3d 864, 870, 874 [finding that a "relentless campaign of insults, name-calling, and vulgarities" toward a worker due to his "fail[ure] to conform to a male stereotype" constituted a hostile environment].) The captive audience context of a workplace heightens the possibility that "spoken words, either alone or in conjunction with conduct . . . [can] amount to employment discrimination." (*Aguilar*, *supra*, 21 Cal.4th at p. 134 (plur. opn. of George, C. J.).)

The subjective element of the hostile environment framework establishes that a plaintiff has been harmed by harassment. Although prior cases upholding hostile environment claims in more extreme contexts are instructive, "especially egregious examples of harassment" "do not mark the boundary of what is actionable." (*Harris*, *supra*, 510 U.S. at p. 22.) Stated differently, the subjective harm required to find a hostile environment need not be "egregious." (*Ibid*.) In *Harris*, the court expressly rejected the contention that a plaintiff must demonstrate that challenged conduct " '*seriously* affect[ed] [a resident's] psychological well-being' " or "cause[d] a tangible psychological injury," as some circuit courts had previously held. (*Id.* at pp. 20 & 21, italics added.)[20] Rather than mandate a

---

[20] See also California Code of Regulations, title 2, section 12120, subdivision (a)(3)(ii) ("Neither psychological nor physical harm must be demonstrated to prove that a hostile environment

threshold level of harm, the subjective element requires that the victim personally "perceive the environment to be abusive." (*Harris*, at p. 21.)

As in the employment context, federal and state fair *housing* laws also employ a hostile environment framework to proscribe discriminatory conduct that implicates speech. (42 U.S.C. §§ 3601–3619; *Beliveau v. Caras* (C.D.Cal. 1995) 873 F.Supp. 1393, 1396–1397 (*Beliveau*) [canvassing cases applying a hostile environment framework concerning the FHA]; Gov. Code, §§ 12900 et seq. [FEHA], 12927, subd. (c)(1) [defining " '[d]iscrimination' " as "includ[ing] harassment in connection with . . . housing accommodations"]; *Brown v. Smith* (1997) 55 Cal.App.4th 767, 783–784 [applying the standard set out in *Harris, supra,* 510 U.S. at p. 23, in reviewing a claim of sexual harassment under the FEHA].)

Long-term care facilities often function as a home to their residents,[21] and the home has long been recognized as a context deserving of special protection. (*Rowan v. Post Office Dept.* (1970) 397 U.S. 728, 738 [observing that although "we are often 'captives' outside the sanctuary of the home and subject to objectionable speech and other sound does not mean we must be

---

existed or exists. Evidence of psychological or physical harm may, however, be relevant in determining whether a hostile environment exists or existed, as well as the amount of damages to which an aggrieved person may be entitled").

[21] See *Montano v. Bonnie Brae Convalescent Hosp., Inc.* (C.D.Cal. 2015) 79 F.Supp.3d 1120, 1125 (treating a skilled nursing facility as a covered entity under the FEHA because " '[t]o the handicapped elderly persons who would reside there, [the facility] would be their home, very often for the rest of their lives' ").

captives everywhere" and concluding "[t]he asserted right of a mailer . . . stops at the outer boundary of every person's domain"]; *FCC v. Pacifica Foundation* (1978) 438 U.S. 726, 748–749 [upholding an administrative condemnation by the Federal Communications Commission against a radio station for broadcasting an "indecent" monologue during hours when young children might be listening at home]; *Frisby v. Schultz* (1988) 487 U.S. 474, 487 [upholding an ordinance prohibiting picketing in front of an individual's residence on a public street].)

Likewise, and equally salient in the present setting, the high court has reasoned that the medical care setting also is a captive audience environment and it has upheld challenges to laws affecting speech in that context as well. (*Madsen v. Women's Health Center, Inc.* (1994) 512 U.S. 753, 768–773 [upholding restriction on picketing and related activity outside a health clinic that performed abortions]; *Hill v. Colorado* (2000) 530 U.S. 703, 715–718, 729 [upholding a criminal statute that prohibited knowingly approaching within eight feet of another person near a health care facility, without the other person's consent, for the purpose of leafleting, protesting, or counseling any other person].) As discussed below, those living in facilities regulated by the challenged statute, and whom the Legislature has sought to protect, present a paradigmatic example of a captive audience.

> 4. *Health and Safety Code section 1439.51,*
> *subdivision (a)(5) lawfully prohibits willful and*
> *repeated misgendering that creates a hostile*
> *environment in the long-term care setting*

We conclude that the Legislature, in enacting Health and Safety Code section 1439.51, subdivision (a)(5), intended, consistent with Title VII jurisprudence, to proscribe harassment

in the long-term care setting in the form of "repeated[]" acts of misgendering that are severe or pervasive enough to create an objectively hostile environment and that necessarily would be "subjectively perceive[d] . . . to be abusive" (*Harris, supra,* 510 U.S. at p. 21) because they were "[w]illfully" committed despite "clear[]" and prior notice "of the preferred name or pronouns," "wholly or partially on the basis of a person's actual or perceived sexual orientation, gender identity, gender expression, or human immunodeficiency virus (HIV) status." (Health & Saf. Code, § 1439.51, subd. (a)(5).)

> a. *The objective element: The statute proscribes misgendering that is sufficiently severe or pervasive to create an objectively hostile environment*

Concerning the first component, it seems plain that Health and Safety Code section 1439.51, subdivision (a)(5) is intended to target a particularly pernicious form of harassment aimed at a vulnerable captive audience. Viewed in this light, the willful and repeated misgendering of a long-term care resident by those employed to provide such care may well create an "environment that a reasonable person would find hostile or abusive" (*Harris, supra,* 510 U.S. at p. 21), judged "from the perspective of a reasonable person in the [resident's] position" (*Oncale, supra,* 523 U.S. at p. 81). LGBT seniors who "must rely on others for necessary care and services, and may no longer enjoy the privacy of having their own home or even their own room," could reasonably perceive that willful and repeated misgendering by their caretakers creates a hostile or abusive environment. (Stats. 2017, ch. 483, § 1, subd. (b).)

As observed *ante,* part I.A., the Legislature enacted Health and Safety Code section 1439.51, subdivision (a)(5) as

part of a comprehensive scheme designed to counteract risks that LGBT residents in long-term care residential facilities would face particularly invasive discriminatory *conduct.* The challenged regulation is found along with other provisions that limit myriad specific "actions" of "long-term care facility or facility staff." (Health & Saf. Code, § 1439.51, subd. (a).) In this way the statute clarifies prohibited *conduct* undertaken "wholly or partially *on the basis of* a person's actual or perceived sexual orientation, gender identity, [or] gender expression" (*ibid.*, italics added), including "refusing to assign a room to a transgender resident," "[p]rohibit[ing] a resident from using . . . a restroom available to other persons of the same gender identity," and "[w]illfully and repeatedly fail[ing] to use a resident's preferred name or pronouns after being clearly informed of the preferred name or pronouns" (*id.*, subd. (a)(3), (4) & (5)). The other prohibited actions listed within subdivision (a), most of which do not implicate speech, include "[d]eny[ing] admission," "[d]eny[ing] a request by residents to share a room," "[d]eny[ing] a resident the right to wear or be dressed in clothing . . . permitted for any other resident," "[r]estrict[ing] a resident's right to associate with other residents," and "[d]eny[ing] or restrict[ing] medical or nonmedical care." (*Id.*, subd. (a)(1), (2), (6), (7) & (8).)

Moreover, as also observed *ante*, part I.A., the Legislature cited a national study finding that nearly half of respondents witnessed or experienced a variety of mistreatment directed at LGBT seniors in long-term care facilities, including refusal of admission; abrupt discharge; verbal or physical harassment by staff, refusal to accept medical power of attorney from a resident's spouse or partner, discriminatory restrictions on visitation — as well as refusal to refer to a transgender resident

by that person's "preferred pronoun" or chosen name. The cited study indicated that a majority of respondents believed this conduct in the long-term residential care context could "rise to the level of abuse or neglect." (Stats. 2017, ch. 483, § 1, subd. (c).)

The legislative history of Health and Safety Code section 1439.51, subdivision (a)(5) similarly evinces concern about the impact of discriminatory conduct in "long-term care facilities where residents are particularly vulnerable." (Stats. 2017, ch. 483, § 1, subd. (b).) Like hostile housing environment claims under both our FEHA and the federal FHA, harassment in long-term care facilities — home to residents therein — is especially harmful due to its invasive impact on a captive audience seeking medical treatment and / or intimate personal care. (See, e.g., *Salisbury v. Hickman* (E.D.Cal. 2013) 974 F.Supp.2d 1282, 1292 ["Courts have recognized that harassment in one's own home is particularly egregious and is a factor that must be considered in determining the seriousness of the alleged harassment"]; *Beliveau, supra*, 873 F.Supp. at p. 1397, fn. 1 [harassment in the home is "more oppressive" because whereas a worker may decide to exit the workplace, one cannot so easily avoid harassment in one's domicile].)

     b. *The subjective element: The statute proscribes conduct that the Legislature has determined would be perceived to be harassing or abusive*

Scholarly research — which can properly be considered in the context of a facial challenge such as this — underscores that intentional and repeated misgendering often will exceed the level of subjective harm that would be required to support a hostile workplace or hostile housing environment claim. As described in various publications submitted by amici curiae,

many LGBT seniors report experiencing mistreatment and discrimination, such as misgendering, in health care settings — including by staff in long-term residential care facilities.[22]  As the California Assisted Living Association articulates, in the health care setting, when an employee tasked with caring for a resident refuses to use that resident's name or pronouns, "it communicates to residents that they do not belong, that their dignity is of no value, and that they are individuals who are undeserving of help."  Indeed, and apparently for corresponding reasons, current federal regulations governing long-term care facilities require facility staff to treat residents with "respect and dignity" and "care for each resident in a manner and in an environment that promotes maintenance or enhancement of . . .

---

[22]  Justice in Aging et al., Stories from the Field:  LGBT Older Adults in Long-Term Care Facilities (2010, updated 2015) at pages 8–17 <https://justiceinaging.org/wp-content/uploads/2015/06/Stories-from-the-Field.pdf> (as of Nov. 6, 2025) (all Internet citations in this opinion are archived by year, docket number and case name at <https://courts.ca.gov/opinions/cited-supreme-court-opinions>); cf. Medina et al., Center For American Progress, Protecting and Advancing Health Care for Transgender Adult Communities (Aug. 18, 2021) figure 13, at <https://www.americanprogress.org/article/protecting-advancing-health-care-transgender-adult-communities/> (as of Nov. 6, 2025) [finding that 32 percent of transgender respondents — and 46 percent of transgender respondents of color — reported that in the prior year, a doctor intentionally used the wrong name when addressing or referring to them]; Fasullo et al., *LGBTQ Older Adults in Long-Term Care Settings:  An Integrative Review to Inform Best Practices* (2022) 45 Clinical Gerontologist 1087, 1090–1093.

quality of life"[23] — and, significantly, related guidelines specify that "[s]taff should address residents with the name or pronoun of the resident's choice."[24] As discussed above, in enacting the

_____

[23] See 42 Code of Federal Regulations part 483.10(a)(1) (2025); see also *id.*, part 483.10(a) (a resident has a "right to a dignified existence . . . [and] self-determination"), (e) (2025) (a resident has the "right to be treated with respect and dignity").

[24] Centers for Medicare and Medicaid Services, United States Department of Health and Human Services, Revisions to State Operations Manual, Appendix PP, Guidance to Surveyors for Long Term Care Facilities (Rev. No. 229, Apr. 25, 2025) F550, GUIDANCE § 483.10(a)–(b)(1) & (2) at <https://www.cms.gov/files/document/r229soma.pdf> (as of Nov. 6, 2025).

Relatedly, amici curiae Scholars in Social Work, Gerontology, and Social Science explain, consistently with other social science research (Russell et al., *Chosen Name Use Is Linked to Reduced Depressive Symptoms, Suicidal Ideation, and Suicidal Behavior Among Transgender Youth* (2018) 63 J. of Adolescent Health 503, 505; Lelutiu-Weinberger et al., *The Roles of Gender Affirmation and Discrimination in the Resilience of Transgender Individuals in the U.S.* (2020) 46 Behavioral Medicine 175, 182), misgendering "against transgender persons, including discrimination in gender affirmation, is associated with higher odds of suicidal ideation, psychological distress, and substance abuse." (Accord, e.g., Vigny-Pau et al., *Suicidality and Non-Suicidal Self-Injury Among Transgender Populations: A Systematic Review* (2021) 25 J. of Gay & Lesbian Mental Health 358, 367; Seelman et al., *Transgender Noninclusive Healthcare and Delaying Care Because of Fear: Connections to General Health and Mental Health Among Transgender Adults* (2017) 2 Transgender Health 17, 25–26; Adams & Vincent, *Suicidal Thoughts and Behaviors Among Transgender Adults in Relation to Education, Ethnicity, and Income: A Systematic Review* (2019) 4 Transgender Health 226, 237–238.) Conversely, the same amici curiae relate that "the use of the affirmed names and

LGBT Long-Term Care Residents' Bill of Rights, the Legislature found that the discrimination, including in the form of misgendering, that LGBT seniors experience in long-term care facilities led them to avoid accessing care on which their health, safety, and security depended.  (Stats. 2017, ch. 483, § 1.)

Without attempting to delineate the application of the statute in all possible scenarios in response to this facial challenge, it is apparent that Health and Safety Code section 1439.51, subdivision (a)(5) will be violated when willful and repeated misgendering has occurred in the presence of a resident, the resident hears or sees the misgendering, and the resident is harmed because the resident perceives that conduct to be abusive.  Similarly, the provision will be violated (and harm to a resident established) when there is evidence that a resident who did not personally hear willful and repeated misgendering nevertheless has become aware from others (residents, staff, or visitors) that, for example, a particular staff person has so misgendered that resident elsewhere within the facility's grounds, or otherwise in conjunction with that person's job-related role, thus leading that resident to perceive both that misgendering and its abusive nature.  We find this understanding of the statute's scope to be consistent with the Legislature's apparent intent reflected in its findings (Stats. 2017, ch. 483, § 1, subds. (a)–(e)), with the accompanying

_____

pronouns of transgender persons is associated with fewer depressive symptoms and less suicide ideation, suicidal behavior, and psychological distress."  (See The Trevor Project, National Survey on LGBTQ Youth Mental Health 2020 Supporting Transgender & Nonbinary Youth, at <https://www.thetrevorproject.org/wp-content/uploads/2020/07/The-Trevor-Project-National-Survey-Results-2020.pdf> [as of Nov. 6, 2025]; cf. *Chosen Name Use*, at p. 505.)

legislative history mentioned earlier, and with the high court's admonition in *Harris, supra,* 510 U.S. at page 23, that courts must consider "all the circumstances" in analogous contexts.[25]

On the other end of the spectrum is plaintiff's hypothetical scenario in which no resident has heard or seen willful and repeated misgendering of a resident — and furthermore has no awareness of any such conduct — and hence no resident experiences harm. Without more, the possibility that the state would attempt to establish a violation of the statute in that situation does not render the prohibition facially invalid.

c. *Summary: The limited scope of Health and Safety Code section 1439.51, subdivision (a)(5)*

Contrary to plaintiff's broad contentions, we conclude that nothing in the language or legislative history of Health and Safety Code section 1439.51, subdivision (a)(5), suggests that it was intended to reach, or that it does reach, "all forms of speech *in all contexts whatsoever.*" (Italics added.) The provision is carefully calibrated and does not reach conduct or expression that occurs outside the campus of a long-term residential care facility, and which also is outside the business-related role of its staff. So viewed, the provision generally leaves long-term care staff members free to express their views about gender in any otherwise lawful manner, and it allows such persons to express

---

[25] Indeed, employment law decisions by federal courts have found that harassing conduct occurring outside a plaintiff's presence, but about which a plaintiff becomes aware, can contribute to a plaintiff's perception of a hostile work environment. (E.g., *Davis v. Team Elec. Co.* (9th Cir. 2008) 520 F.3d 1080, 1095 ["Offensive comments do not all need to be made directly to an employee for a work environment to be considered hostile"].)

such viewpoints elsewhere outside the workplace, including in their own "home[s], on the sidewalk, in the park, in [a] restaurant or on the Internet." (*Aguilar, supra,* 21 Cal.4th at p. 164 (conc. opn. of Werdegar, J.).)[26]

### E. Decisions in the Compelled Speech and Associational Contexts Finding Exceptions to the General Rule That Discriminatory Conduct Is Constitutionally Unprotected Are Inapplicable Here

The United States Supreme Court has applied First Amendment scrutiny to public accommodations and anti-discrimination statutes in certain circumstances that are

---

[26] When an act of misgendering results in the disclosure of a resident's private medical information, that act may constitute a violation of federal and / or related state medical privacy statutes. (See Health & Saf. Code, § 1439.53, subd. (a) ["Long-term care facilities shall protect personally identifiable information regarding residents' sexual orientation, [and] whether a resident is transgender . . . from unauthorized disclosure"]; *ibid.* [clarifying that this rule applies to the extent nondisclosure of such private medical information is "required" by existing federal and state rights to privacy under "the federal Health Insurance Portability and Accountability Act of 1996 (42 U.S.C. Sec. 300gg), if applicable, the Confidentiality of Medical Information Act (Part 2.6 (commencing with Section 56) of Division 1 of the Civil Code), if applicable, regulations promulgated thereunder, if applicable, and any other applicable provision of federal or state law"]; see also Cal. Const., art. I, § 1 [right of privacy]; *Hill v. National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1, 35 ["[i]nformational privacy is the core value furthered" by the provision]; *County of Los Angeles v. Superior Court* (2021) 65 Cal.App.5th 621, 641–642 [addressing patients' privacy rights concerning their medical records in doctors' files].)

distinguishable from the unique long-term care setting at issue here.

In the commercial context, the high court held that artists cannot be compelled to create " 'pure speech' " that conveys what they represent to reflect their own personal message. (*303 Creative LLC v. Elenis* (2023) 600 U.S. 570, 583 (*303 Creative*).) In that matter the court addressed a plaintiff who planned to design customizable wedding internet pages. The court analogized the website to " 'an uninhibited marketplace of ideas' " (*id.* at p. 585) and its holding "flow[ed] directly from the parties' stipulations," including that the plaintiff's "websites promise to contain 'images, words, symbols, and other modes of expression' " and that every website prepared "will be [the plaintiff's] 'original, customized' creation" designed to " 'celebrate and promote the couple's wedding and unique love story' and to 'celebrat[e] and promot[e]' what [the plaintiff] understands to be a true marriage." (*Id.* at p. 587.)

In *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.* (1995) 515 U.S. 557 (*Hurley*), the high court found unconstitutional the application of a public accommodations law that would have required private parade organizers to allow an LGBT group bearing a banner to participate in the organizers' parade. The court observed that a parade is a "medium[] of expression" (*id.* at p. 569) composed of "marchers who are making some sort of collective point, not just to each other but to bystanders along the way." (*Id.* at p. 568.) Because the speech of each unit of the parade "distilled" the "overall message" conveyed by the private organizers (*id.* at p. 577), the court in *Hurley* reasoned that the contested application would improperly render "speech itself to be the public accommodation." (*Id.* at p. 573.) Likewise, in the

associational context, the high court in *Boy Scouts of America v. Dale* (2000) 530 U.S. 640 (*Boy Scouts*) considered the "forced inclusion" of a gay rights activist as an assistant scoutmaster of the Boy Scouts. (*Id.* at p. 648.) The decision invalidating this application on the statute found that compelled association would "send a message, both to the youth members and the world" about the organization's own beliefs. (*Id.* at p. 653.)[27]

By contrast, the present case does not involve any analogous creative product or expressive association as in *303 Creative* and *Hurley*. As previously described, Health and Safety Code section 1439.51, subdivision (a)(5) targets discriminatory *conduct* aimed at vulnerable seniors who need to reside in long-term care facilities — and are hence a captive audience — in order to acquire intimate personal care and related medical treatment. The provision seeks to render the long-term care environment conducive to such care and treatment. Unlike the situation presented in *303 Creative*, the challenged provision does not implicate a traditional marketplace of ideas setting or regulate a commercial context involving the production of original, customized creations that express the creator's own message. Nor, as in *Hurley* and *Boy Scouts*, does the provision implicate compelled membership or inclusion in a private expressive association.

We view such high court decisions as reflecting context-specific applications of First Amendment principles. Such

___

[27] The court later clarified that *Boy Scouts* is inapplicable when a statute "does not force [an organization] to ' "accept members it does not desire," ' " and explained that a "speaker cannot 'erect a shield' against laws requiring access 'simply by asserting' that mere association 'would impair its message.' " (*Rumsfeld, supra,* 547 U.S. at p. 69.)

decisions are not inconsistent with the high court's line of authority repeatedly declining to subject discriminatory conduct, including the creation of hostile environments under Title VII, to First Amendment scrutiny. Nothing in *303 Creative*, *Hurley*, or *Boy Scouts* suggests that the anti-discrimination law reflected in Health and Safety Code section 1439.51, subdivision (a)(5) should be subjected to the kind of First Amendment scrutiny found to be warranted in those cases.

## F. The Recent Decision in *Free Speech Coalition*

After oral argument in this matter, the United States Supreme Court filed its opinion in *Free Speech Coalition, Inc. v. Paxton* (2025) 606 U.S. 461 (*Free Speech Coalition*). We vacated submission and directed the parties to address the effect, if any, of *Free Speech Coalition* on the issues here. Having considered those submissions (and corresponding briefing by amicus curiae on behalf of plaintiff), we conclude that *Free Speech Coalition* alters neither our above-articulated analysis nor our conclusion in this matter.

In *Free Speech Coalition*, the high court addressed a state law requiring certain commercial websites publishing sexually explicit content to verify that users of such websites are at least 18 years old. The court rejected the petitioners' contention that the law was a content based measure subject to strict scrutiny under *Reed*, *supra*, 576 U.S. at page 163 and related decisions. (*Free Speech Coalition*, *supra*, 606 U.S. at p. 482.) Yet the court also rejected the state's assertion that because the law regulates obscene speech that minors have no right to access, the statute is subject to mere rational basis review. (*Id.* at p. 495.) Although the court concluded that the statute regulated "unprotected" speech insofar as it sought to prevent minors from

accessing speech that they have no right to view (*id*. at p. 482), it determined the law was subject to intermediate scrutiny because it had an incidental burden on protected speech — namely, the right of *adults* "to access speech that is obscene only to minors." (*Ibid*.; see also *id*. at p. 495.) The court further concluded that the statute satisfied intermediate scrutiny by " 'advanc[ing] *important governmental interests* unrelated to the suppression of free speech and . . . *not burden*[*ing*] *substantially more speech than necessary* to further those interests.' " (*Id*. at pp. 495–496, italics added.)[28]

In the present case, the challenged provision, Health and Safety Code section 1439.51, subdivision (a)(5), is not a regulation of "*unprotected* activity" that incidentally burdens "*protected* activity" (*Free Speech Coalition, supra,* 606 U.S. at p. 492, italics added.) Instead, although the statute applies to spoken words, it prohibits only unprotected conduct — i.e., repeated misgendering that amounts to discrimination proscribable under well-established law. As the State observes, staff at long term-care facilities have "no protected right to engage in harassment and abuse of residents as a means to

---

[28] In reaching this conclusion, the *Free Speech Coalition* decision noted the importance of protecting minors from sexually explicit content and the minimal burden that age verification posed to adults. Under intermediate scrutiny, "The regulation 'need not be the least restrictive . . . means of' serving the State's interest. [Citation.] And, the regulation's validity ' "does not turn on [our] agreement with the [legislature] concerning the most appropriate method for promoting significant government interests" or the degree to which those interests should be promoted.' " (*Free Speech Coalition, supra,* 606 U.S. at p. 496.)

express their opposition to LGBT rights." Accordingly, the high court's holding in *Free Speech Coalition* does not bear on the present matter.

Moreover, *Free Speech Coalition* neither explicitly, nor even implicitly, casts doubt on our earlier analysis and conclusion that state and federal anti-discrimination laws — including the Unruh Civil Rights Act (Civ. Code, § 51 et seq.), the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.), and Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.) — permissibly regulate discriminatory *conduct* and do not necessitate any heightened scrutiny. We decline to read *Free Speech Coalition* as silently undermining or overruling the high court's own pronouncements, including in *R. A. V.*, *supra*, 505 U.S. 377, that we have relied upon and applied *ante*, part III.D.

Assuming, for argument's sake, that *Free Speech Coalition* bears on the present matter, the high court's recent opinion would support our determination that strict scrutiny is inapplicable in this context. In explaining why strict scrutiny analysis was not required in the setting under consideration, the court repeatedly described age-verification laws for accessing pornography as "traditional [and] widespread" (*Free Speech Coalition*, *supra*, 606 U.S. at p. 485; see also *id*. at, e.g., pp. 485, 493), and relied on that history in declining to "adopt a position that would call into question the constitutionality of [such] longstanding . . . requirements." (*Id*. at p. 494.) Likewise, in the present case, the challenged statute's prohibition on willful and repeated misgendering is, as the State observes, "materially indistinguishable from nondiscrimination and harassment laws" that have long been "commonplace at the federal, state, and local levels." *Free Speech Coalition* counsels that we should

avoid any rigid mode of inquiry that would call into question the constitutionality of longstanding anti-discrimination and hostile environment statutes. (*Ibid.* ["A decision 'contrary to long and unchallenged practice . . . should be approached with great caution' "].)

Even if we were to assume, solely for purposes of argument, that *Free Speech Coalition* requires that we apply *intermediate* scrutiny, the challenged provision would easily survive such review.

Like the statute at issue in *Free Speech Coalition*, which the court found imposed "only [an] incidental" burden on adults' First Amendment rights (*Free Speech Coalition*, *supra*, 606 U.S. at p. 483), any burden on expression imposed by Health and Safety Code section 1439.51, subdivision (a)(5)'s misgendering provision is modest, and reasonably characterized as incidental. The statute applies only to willful and repeated misgendering that creates a hostile environment in the long-term care setting, and preserves "ample alternative channels of communication." (*Aguilar, supra*, 21 Cal.4th at p. 164 (conc. opn. of Werdegar, J.).) In doing so the provision " 'advances important governmental interests unrelated to the suppression of free speech.' " (*Free Speech Coalition*, at pp. 495–496.)

The statute's prohibition on repeated and willful misgendering in the narrow context at issue here "is plainly a legitimate legislative choice." (*Free Speech Coalition, supra*, 606 U.S. at p. 496.) As discussed earlier, the Legislature could reasonably determine that barring willful and repeated misgendering in the long-term care setting will facilitate residents' medical and related intimate personal care by fostering an environment that is conducive to, and does not

interfere with or undermine, such care. The challenged provision furthers this important state interest.

The statute is also sufficiently tailored to address the state's important interest, which " 'would be achieved less effectively absent the regulation.' " (*Free Speech Coalition*, *supra*, 606 U.S. at p. 496.) Under intermediate scrutiny, the state need not show that a regulation is the least restrictive way to achieve its interest. (*Ibid.*; see *ante*, fn. 28.) As previously described, the provision is limited to willful, repeated, and knowing acts done on the basis of a protected characteristic, and it applies only in the regulation of those whose job is to provide intimate personal and medical care to long-term care residents. The provision does not prevent facility staff from expressing their views about gender in any otherwise lawful manner. Moreover, the statute reaches solely conduct that creates a hostile environment. Accordingly, the provision " 'does not burden substantially more speech than is necessary to further' " the state's important interest. (*Free Speech Coalition*, at p. 496.)

### G. The Possibility of Criminal Penalties for Particularly Egregious Violations of the Challenged Statute Does Not Render It Facially Invalid

As plaintiff observes, violations of the LGBT Long-Term Care Residents' Bill of Rights, including the pronouns provision, are subject not only to pre-existing and long-established civil and administrative proceedings and penalties, but also to the possibility of pre-existing and long-established *criminal* prosecution and corresponding penalties consisting of fines up to $2,500 and up to 180 days, or even one year, in county jail. (See Health & Saf. Code, § 1439.54, quoted *ante*, fn. 5; Health & Saf. Code, §§ 1290, subd. (c) [governing violations of chs. 2,

concerning "Health Facilities," and 2.4, concerning "Long-Term Health Facilities"], 1569.40, subd. (a) [governing violations of ch. 3.2, concerning "Residential Care Facilities for the Elderly"].) Contrary to plaintiff's contention, the circumstance that enforcement could, in an outlier case, potentially involve criminal penalties does not call for invalidation of the challenged pronouns provision in this facial challenge.

Plaintiff quotes the high court's decision in *Ashcroft v. American Civil Liberties Union* (2004) 542 U.S. 656, 660: "Content-based prohibitions, enforced by severe criminal penalties, have the constant potential to be a repressive force in the lives and thoughts of a free people." Plaintiff asserts broadly that "criminalizing and compelling speech content" via Health and Safety Code section 1439.51, subdivision (a)(5) cannot be viewed as "the least restrictive means to accomplish" the state's objectives in this case, and plaintiff suggests the provision should be invalidated on its face for this reason. In addressing plaintiff's objection to the prospect of criminal prosecution and penalties, the Court of Appeal rejected the notion that civil penalties are, by their very nature, a less restrictive means of enforcement. (*Taking Offense, supra*, 66 Cal.App.5th at p. 720.) Yet, as noted earlier, the appellate court ultimately determined that whether enforced through either civil or criminal penalties, the statute is insufficiently narrowly tailored (*ibid.*), and it faulted the enactment for "criminalizing" more speech than "necessary to advance [its legitimate] goal." (*Id.* at p. 721.)

Plaintiff misapprehends the prospect of criminal penalties in this particular setting and fails to recognize substantial constraints imposed by the Legislature concerning these penalties. Misdemeanor-level criminal prosecution and ensuing punishment is far from required, or even generally

contemplated as an appropriate course and penalty under the scheme. In this respect, it is useful to review the legislative history, both to understand (1) how and why criminal penalties became available as a means of addressing violations of the Health and Safety Code's various provisions concerning long-term care facilities, and (2) how and under what circumstances the Legislature contemplates that such penalties would be appropriate in this particular setting.

As noted, the Legislature enacted Health and Safety Code section 1439.54 as its mechanism to enforce the LGBT Long-Term Care Residents' Bill of Rights. By virtue of that statute, which incorporates pre-existing penalty provisions pertaining to the three specific chapters previously identified, licensed entities and their staffs who violate any of the enactment's proscriptions are subject to the same *civil* penalties and fines, and administrative penalties (including suspension or revocation of licenses) that have long been applicable to violations of myriad other duties imposed on long-term care facilities and their staffs, including those requiring that each patient be treated "with dignity and respect," and be provided "with good hygiene." (*California Assn. of Health Facilities v. Department of Health Services* (1997) 16 Cal.4th 284, 292; see, e.g., Health & Saf. Code, §§ 1294 [suspension or revocation of licenses concerning health facilities], 1423, 1424, 1424.5, 1425 [administrative citations and wide-ranging civil fines and penalties concerning long-term health facilities], 1569.49 [civil penalties concerning residential care facilities for the elderly], 1569.59 [suspension or revocation of licenses concerning residential care facilities for the elderly].)

In addition to these civil and administrative penalties, other provisions within the Health and Safety Code, first

adopted more than 50 years ago, subject some violations relating to long-term care facilities to possible criminal prosecution, with resulting misdemeanor fines and / or potential imprisonment in the county jail. Beginning in 1973, Health and Safety Code section 1290 imposed a fine of up to $500, and up to 180 days in county jail, for such violations relating to what were then colloquially called nursing homes. (Stats. 1973, ch. 1202, § 2, p. 2572.) Yet despite these and related laws, a comprehensive 1983 report commissioned by the Legislature revealed that residents of such long-term care facilities continued to face persistent substandard care, with tragic consequences. (See Little Hoover Com. (Aug. 1983) The Bureaucracy of Care — Continuing Policy Issues for Nursing Home Services and Regulation (Little Hoover Commission report).) That report recommended enhanced use of criminal prosecution and penalties to address the most egregious forms of neglect and abuse. (*Id*. at p. 93.)

The Legislature responded to the Little Hoover Commission report in 1985 by, among other things, further amending Health and Safety Code section 1290, adding subdivision (c). (Stats. 1985, ch. 10, § 5, p. 24.) That subdivision has since provided: "Any person who willfully or repeatedly violates . . . chapter [2, governing Health Facilities] or Chapter 2.4 [governing Long-Term Health Facilities] . . . , or any rule or regulation adopted under this chapter, relating to the operation . . . of a long-term health care facility . . . is guilty of a misdemeanor . . . punish[able] by a fine not to exceed . . . $2,500 . . . or by imprisonment in county jail . . . not to exceed

180 days, or by both."[29] Significantly, the amended subdivision instructs courts "determining the punishment to be imposed upon a conviction under this subdivision" to "consider all relevant facts, including, but not limited to, the following: [¶] (1) Whether the violation exposed the patient to the risk of death or serious physical harm. [¶] (2) Whether the violation had a direct or immediate relationship to the health, safety, or security of the patient. [¶] (3) Evidence, if any, of willfulness. [¶] (4) The number of repeated violations. [¶] (5) The presence or absence of good faith efforts by the defendant to prevent the violation." (Health & Saf. Code, § 1290, subd. (c).) The 1985 amendment also added an important final subdivision: "For the purposes of this section, 'willfully' or 'willful' means the person doing an act or omitting to do an act intends the act or omission,

---

[29] Health and Safety Code section 1569.40, subdivision (a) provides similarly regarding violations of chapter 3.2, concerning "Residential Care Facilities for the Elderly." As adopted in 1985, the statute provided: "Any person who violates this chapter, or who willfully or repeatedly violates any rule or regulation adopted under this chapter, is guilty of a misdemeanor and upon conviction thereof shall be punished by a fine not to exceed one thousand dollars ($1,000) or by imprisonment in the county jail for a period not to exceed 180 days, or by both a fine and imprisonment." (Stats. 1985, ch. 1127, § 3, p. 3821.) As amended a few years later in light of an ensuing report (Little Hoover Com. (Jan. 1989) Report on Community Residential Care of the Elderly) documenting continuing abuse at such facilities and making various recommendations, including enhanced criminal prosecution (*id.* at p. 39), the statute was revised to read as it does today, reflecting a fine of up to $1,000 and a potential jail term of up to "one year, or by both the fine and imprisonment." (Stats. 1989, ch. 1115, § 14, p. 4098.)

and knows the relevant circumstances connected therewith." (*Id.*, subd. (d).)

Accordingly, by virtue of Health and Safety Code section 1439.54, violations of all parts of the LGBT Long-Term Care Residents' Bill of Rights, including the challenged pronouns provision, are subject not only to civil and administrative penalties, but also to possible criminal prosecution, leading to potential fines and incarceration in the county jail. And yet it seems apparent that the Legislature does not intend for such criminal penalties to be imposed except as a last resort, in the most egregious circumstances — after (1) assessment of "all relevant facts" and limiting considerations, especially those focusing on a resident's health and safety, set out in Health and Safety Code section 1290, subdivision (c); and (2) in light of the specifically narrowed understanding of " 'willfully' " and " 'willful' " set out in that section's subdivision (d).

Plaintiff's briefing does not explicitly contest the propriety of a possible criminal prosecution against a long-term care *entity*, which can of course be subjected only to criminal fines, and cannot be imprisoned. It is not apparent that criminal prosecutions would inevitably subject such entities to penalties more severe than those available through civil and administrative proceedings. Moreover, as the Court of Appeal below observed, criminal prosecutions, compared with civil or administrative proceedings, afford defendants greater procedural safeguards. (*Taking Offense*, *supra*, 66 Cal.App.5th at p. 720.)

In any event, plaintiff focuses on the possible criminal prosecution of an *individual* — a hypothetical employee of a long-term care facility who, for personal reasons, willfully and

repeatedly refuses to comply with Health and Safety Code section 1439.51, subdivision (a)(5). Apparently, plaintiff believes that in no foreseeable circumstance could a criminal prosecution be justified, nor could a court appropriately impose a penalty that includes imprisonment in county jail for such a violation of the challenged pronouns provision.

We assume that willful and repeated misgendering that does not egregiously affect a resident's medical treatment or intimate personal care would, as a general matter, be addressed under civil and administrative law by imposing fines and related penalties. Yet we cannot foreclose the possibility that violations of the challenged pronouns provision might, in some circumstances, bear a direct relationship to the health of a resident, and indeed contribute to serious physical harm or even death, and hence constitute conduct so egregious as to be appropriately charged as a crime, and ultimately trigger a court's duty to undertake the highly fact-based sentencing inquiry that the Legislature has required under Health and Safety Code section 1290, subdivision (c).

Accordingly, we conclude plaintiff has failed to demonstrate that the remote possibility of prosecution and enforcement by way of criminal penalties for particularly egregious violations of Health and Safety Code section 1439.51, subdivision (a)(5)'s pronouns provision renders it facially unconstitutional. We express no opinion regarding the merits of any future as-applied challenge that might arise concerning such enforcement of the statute.

## IV. DISPOSITION

Plaintiff's facial challenge to Health and Safety Code section 1439.51, subdivision (a)(5) fails because the pronouns

provision constitutes a regulation of discriminatory conduct that incidentally affects speech, is not subject to First Amendment scrutiny as an abridgment of the freedom of speech, and plaintiff has not carried its burden to "demonstrate . . . invalidity in 'at least " 'the generality' " [citation] or "vast majority" ' of cases" under the " 'exacting' " standard of a facial challenge. (*Martinez, supra*, 15 Cal.5th at p. 352.)   Nor is the statute subject to intermediate scrutiny.   But even assuming that intermediate scrutiny applies, the provision easily satisfies that test. Accordingly, we reverse the Court of Appeal's judgment, and remand for further proceedings consistent with this opinion.

**GUERRERO, C. J.**

**We Concur:**

**CORRIGAN, J.**
**GROBAN, J.**
**EVANS, J.**
**JENKINS, J.**[*]

---

[*]      Retired Associate Justice of the Supreme Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

TAKING OFFENSE v. STATE OF CALIFORNIA

S270535


Concurring Opinion by Chief Justice Guerrero


As observed *ante*, majority opinion, part III.D., we conclude that Health and Safety Code section 1439.51, subdivision (a)(5) is properly analyzed, and upheld, as a regulation of discriminatory conduct that incidentally affects speech — and is not subject to a heightened analysis under the First Amendment. I write separately to explain that even assuming the Court of Appeal below was correct in concluding that *Reed v. Town of Gilbert* (2015) 576 U.S. 155 (*Reed*) requires that we view the challenged pronouns provision as content-based — and further, that *Reed* also requires that we exercise strict scrutiny review — the challenged provision still survives plaintiff's facial challenge.

## I. STRICT SCRUTINY ANALYSIS

As observed *ante*, majority opinion, part III.C., in *Reed* the high court addressed a municipality's regulation that treated disparately various categories of outdoor signage based on the type of information each sign conveyed. The law subjected temporary signs directing the public to a meeting to more stringent restrictions than were applied to signs conveying different messages. (*Reed*, *supra*, 576 U.S. at pp. 159–161.) A religious group that lacked a permanent location, and sought to post signs advertising its Sunday services and locations, challenged the regulation as a content-based abridgment of First Amendment rights. (*Reed*, at p. 162.) The appellate court

1

rejected the challenge and found the law content neutral applying intermediate scrutiny. (*Id*. at pp. 162–163.) The high court reversed, finding the town's law to be "content based on its face." (*Id*. at p. 164.) The court held that such laws, which "target speech based on its communicative content," "are presumptively unconstitutional and may be justified only" if they survive *strict scrutiny* analysis, that is, "if the government proves that they are narrowly tailored to serve compelling state interests." (*Id*. at p. 163.)

When applying *Reed*'s framework in the setting before us, a court must first ask: Is the challenged pronouns provision content based? Although the trial court found the provision to be content neutral, the Court of Appeal held otherwise. It found that under *Reed* the provision must be seen as a content based regulation in that it " 'target[s] speech based on its communicative content' and 'applies to particular speech because of the topic discussed or the idea or message expressed.' " (*Taking Offense v. State of California* (2021) 66 Cal.App.5th 696, 709 (*Taking Offense*), quoting *Reed*, *supra*, 576 U.S. at p. 163.) Significantly, the State of California's (State) briefs in this court do not contest this assessment, and instead appear to agree with it. Indeed, the State asserts: "[I]t would be impossible as a practical matter for the government to craft a truly content-neutral law shielding LGBT long-term care residents from verbal discrimination." In this posture, I would accept, for sake of argument and further analysis only, the appellate court's determination that the challenged pronouns provision is content based.

Based on this threshold position, I review the challenged pronouns provision under strict scrutiny. In approaching this task, I bear in mind key admonitions concerning that test. In

*Adarand Constructors v. Pena* (1995) 515 U.S. 200, the high court remanded with directions to assess a program designed to provide highway contracts to disadvantaged business enterprises under strict scrutiny. The court dispelled the oft-repeated notion that the test is " 'strict in theory, but fatal in fact.' " (*Id.* at p. 237.) Thereafter, in *Grutter v. Bollinger* (2003) 539 U.S. 306 (*Grutter*), the court upheld a law school's affirmative action policy. Explaining that result, the court reiterated that when applying strict scrutiny, "[*c*]*ontext matters.*" (*Id.* at p. 327, italics added; accord, Winkler, *Fatal in Theory and Strict in Fact:  An Empirical Analysis of Strict Scrutiny in Federal Courts* (2006) 59 Vand. L.Rev. 793, 795 [study of 447 cases applying strict scrutiny revealed that in application the test is a "context-sensitive tool" under which 30 percent of challenged laws survive].)

As explained *post*, part I.A., I agree with the Court of Appeal below that the provision is supported by a weighty state interest — "eliminating discrimination on the basis of sex." (*Taking Offense*, *supra*, 66 Cal.App.5th at p. 717, and cases cited.) But I conclude that is an unduly general characterization of the state's compelling interest in this setting. The compelling state interest should be characterized more precisely, as focusing on discrimination in a very narrow context, namely: Advancing a fundamental public health concern by protecting the rights of long-term care residents to be free from discrimination that targets a legally protected characteristic, when that conduct is committed by the staff of a long-term care facility, whose job is to provide and support medical treatment and intimate personal care. As explained below, the challenged provision advances this compelling interest, thus facilitating the ability of such seniors to obtain long-term medical and related

intimate personal care in an environment that is conducive to, and does not undermine, such care.

Moreover, in assessing the strength of such interests in this narrow setting, high court decisions under the "captive audience" doctrine alluded to *ante*, majority opinion, part III.D.3., illuminate key considerations concerning the relevant "context" (*Grutter*, *supra*, 539 U.S. at p. 327). These decisions therefore inform an assessment of the weight that should be attributed to the state's interest, and support a conclusion that the challenged pronouns provision serves a compelling state interest.

Next, as explained *post*, parts I.B., and I.C., I disagree with the Court of Appeal's understanding concerning the scope of the challenged pronouns provision, and with the appellate court's conclusion that the statute must be invalidated in this facial challenge because it is assertedly insufficiently narrowly tailored, or overbroad (*Taking Offense*, *supra*, 66 Cal.App.5th at pp. 720–721).

Finally, as explained *post,* part I.D., I disagree with plaintiff's assertions that the challenged provision fails the "least restrictive alternative" test mandated by *Ashcroft v. American Civil Liberties Union* (2004) 542 U.S. 656, 665 (*Ashcroft*). Relatedly, as reflected *ante*, majority opinion part III.G., we also reject plaintiff's corresponding suggestion that the prospect of enforcement by criminal penalties in especially egregious circumstances renders the provision facially invalid.

## A. The Statute's Pronouns Provision Supports a Compelling State Interest

The high court has "never given a general account of what makes some ends that government may pursue compelling and

others not." (Miller, *What is a Compelling Governmental Interest?* (2018) 21 J. of Markets & Morality 71, 72; see also *id.* at pp. 73–75 [acknowledging the difficulty of defining a compelling state interest]; Fallon, *Strict Judicial Scrutiny* (2007) 54 UCLA L.Rev. 1267, 1336 (*Strict Judicial Scrutiny*) ["The Supreme Court has never squarely confronted, much less solved, the conundrum of the level of generality at which to specify compelling governmental interests"].) Instead, the high court and other courts applying the test — including ours — have simply proceeded under the "common-law method" to focus upon and "decide only whether the particular ends asserted . . . in a given case are compelling." (*What is a Compelling Governmental Interest?*, at p. 73.) I proceed in the same fashion here.

Plaintiff views the challenged pronouns provision as serving no compelling interest, but instead "simply [reflecting the state's] preference for the transgender ideology that gender is a social construct divorced from biological sex," in contrast to plaintiff's own "gender essentialist perspective that biological sex and psychological gender are closely related and virtually always identical." Plaintiff argues that the provision "compels state-sponsored speech" and requires "people to proclaim words that promote only one side of a controversial moral and cultural issue of public concern," contrary to the First Amendment's requirement that " 'the government must remain *neutral in the marketplace of ideas.*' " (Quoting *FCC v. Pacifica Foundation* (1978) 438 U.S. 726, 745–746, italics added (*Pacifica*).)

Plaintiff analogizes to various decisions addressing "compelled speech." In *Meriwether v. Hartop* (6th Cir. 2021) 992 F.3d 492 (*Meriwether*), the court found that a public university professor who believes sex is immutable has a First

Amendment right to express that opinion in the classroom by violating a school mandate that teachers refer to students and others by their "preferred pronouns." (*Meriwether*, at p. 500; *id.* at pp. 503–505.) Quoting that opinion (*id.* at p. 508), plaintiff asserts: " 'Pronouns can and do convey a powerful message implicating a sensitive topic of public concern.' " Likewise, plaintiff relies on *Vlaming v. West Point School Bd.* (Va. 2023) 895 S.E.2d 705. In that decision, the state supreme court held that a public high school teacher who, in class, referred to a transgender student by the pupil's chosen name, but was terminated because he refused to use the pupil's chosen pronouns, stated viable state law claims under the state constitution's religious liberty protections, free speech, and due process clauses, and a corresponding religious freedom statute. Relatedly, plaintiff relies on the high court's decision in *303 Creative LLC v. Elenis* (2023) 600 U.S. 570 (*303 Creative*), which invalidated a state's public accommodation law as applied to a website designer who intended to refuse to create custom wedding pages for gay couples. (*Id.* at pp. 602–603 [the state may not "force an individual to speak in ways that align with its views but defy her conscience about a matter of major significance"].)

In this regard plaintiff further cites high court decisions protecting offensive speech. (*Matal v. Tam* (2017) 582 U.S. 218, 223 [use of an anti-Asian epithet "may not be banned on the ground that it expresses ideas that offend"]; *Snyder v. Phelps* (2011) 562 U.S. 443 [signs and speech with insulting language are constitutionally protected speech]; *R. A. V. v. St. Paul* (1992) 505 U.S. 377 (*R. A. V.*) [cross-burning outside a residence is constitutionally protected speech].) Plaintiff argues that it likewise seeks to protect the constitutional rights of those —

including staff of long-term care facilities — who plaintiff contends wish to similarly offend by willfully and repeatedly misgendering those in their care. Residents "taking offense," plaintiff asserts, can and should engage in debate with their caretakers about this matter of public concern. But, plaintiff argues, the state has no authority to regulate the speech and related conduct of those who are employed to care for such long-term residents in such facilities, because the challenged pronouns provision advances *no* compelling state interest.

Below in part I.A.1., I explain how the statute furthers a compelling and specific state interest. In part I.A.2., I return to the United States Supreme Court's captive audience case law, and explain how that First Amendment doctrine informs an assessment of the strength attributable to the state's interest in this case.

1. *The statute advances the state's compelling interest in protecting long-term care residents' right to be free from discrimination that targets a legally protected characteristic by those whose job is to provide and support medical treatment and intimate personal care, thereby promoting an environment conducive to such care*

As observed *ante*, majority opinion, part I.A., the Legislature articulated in substantial detail its justifications for protecting people who need access to long-term care from willful and repeated misgendering based on a protected characteristic. As an initial matter, the Legislature clearly sought to protect long-term care residents' dignity and right to be free from discrimination as a worthwhile end. But significantly, the history establishes that the Legislature understood that eliminating discrimination also served as a means to achieve a

corresponding goal in this context. That is, the Legislature sought to root out discrimination as necessary to address and improve the physical and mental health of long-term care residents. Specifically, the Legislature concluded that reducing discrimination through the prohibition of misgendering is critical in achieving the goal of encouraging the provision of long-term medical and residential care *in an environment that is conducive to, and that does not interfere with or undermine, such care.* (See Stats. 2017, ch. 483, § 1, subds. (a)–(e).)

Amici curiae on the State's behalf, drawing upon academic literature (some published after enactment of the legislation in 2017) have elaborated on these medical and intimate personal care interests. As noted earlier, the high court has explained that when applying strict scrutiny, such "[c]ontext matters." (*Grutter, supra,* 539 U.S. at p. 327; see also *303 Creative, supra,* 600 U.S. at p. 600, fn. 6 [observing that "context matters" in considering First Amendment challenge to application of public accommodations law].) In the context of this facial challenge, I find it appropriate to consider this literature, advanced by amici curiae, insofar as it illuminates the state's interest in enacting and enforcing the challenged provision. Based on the Legislative findings and the proffered academic literature, the following understanding of the Legislature's rationale emerges.

LGBT seniors, especially those who are transgender, disproportionately need specialized medical, mental health, and related personal care, and yet transgender seniors are less likely than cisgender seniors to have children who are available to

8

assist them.[1]  Many such seniors have reported fearing mistreatment and discrimination by staff in health care settings.[2]  Correspondingly, as observed *ante*, majority opinion, part III.D.3., such seniors have reported mistreatment and discrimination by staff in health care settings, including in long-term residential care facilities.[3]  Transgender seniors often have experienced staff who refuse to use their chosen names and

---

[1]  See Putney et al., *"Fear Runs Deep:" The Anticipated Needs of LGBT Older Adults in Long-Term Care* (2018) 61 J. of Gerontological Social Work 887, 888–890 (*"Fear Runs Deep"*); Pang et al., *Later Life Care Planning and Concerns of Transgender Older Adults in Canada* (2019) 89 The International J. of Aging and Human Development 39, 41, 51 (*Later Life Care Planning*); see generally Fasullo et al., *LGBTQ Older Adults in Long-Term Care Settings: An Integrative Review to Inform Best Practices* (2022) 45 Clinical Gerontologist 1087 (*LGBTQ Older Adults in Long-Term Care Settings*).

[2]  See, e.g., Justice in Aging et al.:  LGBT Older Adults in Long-Term Care Facilities:  Stories from the Field (2010, re-released 2015) pages 6–8, at <https://justiceinaging.org/wp-content/uploads/2015/06/Stories-from-the-Field.pdf>  (as of Nov. 6, 2025) (Stories from the Field) (all Internet citations in this opinion are archived by year, docket number and case name at <https://courts.ca.gov/opinions/cited-supreme-court-opinions>); *"Fear Runs Deep," supra*, 61 J. of Gerontological Social Work, at pages 888, 890–891, 895–899; *LGBTQ Older Adults in Long-Term Care Settings, supra*, 45 Clinical Gerontologist, at pages 1090–1093; Kortes-Miller et al., *Dying in Long-Term Care: Perspectives from Sexual and Gender Minority Older Adults About Their Fears and Hopes for End of Life* (2018) 14 J. of Social Work in End-of-Life & Palliative Care 209, 214–220; *Later Life Care Planning, supra*, 89 The International J. of Aging and Human Development, at pages 48–51.

[3]  See Stories from the Field, *supra*, at pages 8–17; *LGBTQ Older Adults in Long-Term Care Settings, supra*, 45 Clinical Gerontologist at pages 1090–1093.

pronouns.[4]  As also noted *ante*, majority opinion, part III.D.3., The California Assisted Living Association has observed that when a staff member whose job is to provide personal and often highly intimate care repeatedly misgenders a resident, "it communicates to residents that they do not belong, that their dignity is of no value, and that they are individuals who are undeserving of help."  These types of experiences have caused senior LGBT persons to avoid accessing, or to delay obtaining, needed medical and / or corresponding intimate personal care services.[5]

As related by amici curiae Scholars in Social Work, Gerontology, and Social Science, citing relevant academic studies:  "Years of discrimination and stigma can produce cumulative health consequences that negatively impact transgender older adults.[6]  Transgender adults who experience

---

[4]  See, e.g., Stories from the Field, *supra*, at page 14; cf. Medina et al., Center For American Progress, Protecting and Advancing Health Care for Transgender Adult Communities (Aug. 18, 2021) figure 13, at <https://www.americanprogress.org/article/protecting-advancing-health-care-transgender-adult-communities/> (as of Nov. 6, 2025).

[5]  See, e.g., Fredriksen-Goldsen et al., *The Physical and Mental Health of Transgender Older Adults: An At-Risk and Underserved Population* (2014) 54 The Gerontologist 488, 496–498 (*The Physical and Mental Health of Transgender Older Adults*); National Center for Transgender Equality, 2015 U.S. Transgender Survey (2016) pages 10, 219, at <https://transequality.org/sites/default/files/docs/usts/USTS-Full-Report-Dec17.pdf> (as of Nov. 6, 2025).

[6]  The brief cites in support Fabbre and Gaveras, *The Manifestation of Multi-Level Stigma in the Lived Experiences of*

discrimination have increased odds of depressive distress[7] and higher rates of suicide — and these rates increase with higher exposures to discrimination."[8]  And yet, the same amici curiae relate, research confirms "that the use of the affirmed names and pronouns of transgender persons is associated with fewer depressive symptoms and less suicide ideation, suicidal behavior, and psychological distress."[9]  "[C]onversely," the same

---

*Transgender and Gender Nonconforming Older Adults* (2020) 90 American J. of Orthopsychiatry 350.  See *id.* at pages 350–351; see also *The Physical and Mental Health of Transgender Older Adults*, *supra*, 54 The Gerontologist at pages 488, 493–494, 496–498.

[7]    The brief cites in support White, Hughto, and Reisner, *Social Context of Depressive Distress in Aging Transgender Adults* (2018) 37 J. of Applied Gerontology 1517.  See *id.* at pages 1518–1530.

[8]    The brief cites in support Vigny-Pau et al., *Suicidality and Non-Suicidal Self-Injury Among Transgender Populations: A Systematic Review* (2021) 25 J. of Gay & Lesbian Mental Health 358 (*Suicidality Among Transgender Populations*).  See *id.* at pages 359, 367; see also Seelman et al., *Transgender Noninclusive Healthcare and Delaying Care Because of Fear: Connections to General Health and Mental Health Among Transgender Adults* (2017) 2 Transgender Health 17, 26 (*Transgender Noninclusive Healthcare*); Adams & Vincent, *Suicidal Thoughts and Behaviors Among Transgender Adults in Relation to Education, Ethnicity, and Income:  A Systematic Review* (2019) 4 Transgender Health 226 [surveying 64 research projects published in 108 articles over the prior 21 years] (*Suicidal Thoughts and Behaviors Among Transgender Adults*).

[9]    See The Trevor Project, *National Survey on LGBTQ Youth Mental Health* (2020) Supporting Transgender & Nonbinary Youth, at <https://www.thetrevorproject.org/wp-content/uploads/2020/07/The-Trevor-Project-National-Survey-Results-2020.pdf> (as of Nov. 6, 2025); cf. Russell et al., *Chosen*

amici curiae report, "discrimination against transgender persons, including discrimination in gender affirmation, is associated with higher odds of suicidal ideation, psychological distress, and substance abuse."[10]

In other words, amicus curiae California Assisted Living Association asserts, discrimination against LGBT seniors, especially against those who are transgender, constitutes "a health hazard in a long-term care setting." Amici curiae Scholars in Social Work, Gerontology, and Social Science summarize as follows: "Research and practitioner guidelines in medicine, nursing, public health, social work, psychology, and gerontology overwhelmingly confirm the clinical imperative of using affirmed names and gender pronouns of transgender older adults. . . . Requiring the use of affirmed names and gender pronouns of transgender older adults is merely consistent with this well-developed standard of care."[11]  (Fns. omitted.)

---

*Name Use Is Linked to Reduced Depressive Symptoms, Suicidal Ideation, and Suicidal Behavior Among Transgender Youth* (2018) 63 J. of Adolescent Health 503, 505.

[10]  See, e.g., *Suicidality Among Transgender Populations*, *supra*, 25 J. of Gay & Lesbian Mental Health at page 367; *Transgender Noninclusive Healthcare*, *supra*, 2 Transgender Health at pages 25–26; *Suicidal Thoughts and Behaviors Among Transgender Adults*, *supra*, 4 Transgender Health at pages 237–238.

[11]  As observed by amicus curiae California Assisted Living Association, existing state and federal laws mandate respectful treatment of patients by staff at analogous skilled and long-term care facilities.  Under Health and Safety Code section 1569.269, subdivision (a)(1), such residents must be "accorded dignity in their personal relationships with staff, residents, and other persons."  As observed *ante*, majority opinion, part III.D.4.b.,

I agree with the State that the reports cited in the legislative history, viewed together with the research context provided by amici curiae, illuminate the state's specific and focused interest in regulating misgendering that occurs in the long-term care setting. Namely, the pronouns provision is designed to guard an especially vulnerable and marginalized audience against discrimination targeting a legally protected characteristic. It is also designed to do so in a very specific context — targeting such conduct committed by the staff of a long-term care facility whose job is to provide and support medical treatment and intimate personal care, and to foster an environment conducive to such care. The legislation is sensitive to the circumstance that LGBT senior residents of long-term care facilities are, at this point in their lives, committed to medical and related intimate personal care in what have become

related protections under federal law are set out in 42 Code of Federal Regulations. Pursuant to that code's section 483.10(a), a resident has a "right to a dignified existence [and] self-determination"]; under part 483.10(e) (2025), a resident has the "right to be treated with respect and dignity"; and pursuant to part 483.10(a)(1), facility staff must "treat each resident with respect and dignity and care for each resident in a manner and in an environment that promotes maintenance or enhancement of his or her quality of life." Significantly, as also observed in the majority opinion, corresponding federal guidelines specify that long-term care staff "*should address residents with the name or pronoun of the resident's choice.*" (Centers for Medicare and Medicaid Services, U.S. Dept. of Health and Human Services, Rev. to State Operations Manual, Appen. PP, Guidance to Surveyors for Long Term Care Facilities (Rev. No. 229, Apr. 25, 2025) F550; GUIDANCE, at <https://www.cms.gov/files/document/r229soma.pdf> (as of Nov. 6, 2025), italics added.) The later guidance also specifies that staff should not "discuss residents in settings where others can overhear private or protected information." (*Ibid.*)

their new *homes*. (Cf. *Montano v. Bonnie Brae Convalescent Hosp., Inc.* (C.D.Cal. 2015) 79 F.Supp.3d 1120, 1125 [finding a skilled nursing facility to be a covered entity under the California Fair Employment and Housing Act (FEHA; Gov. Code, § 12900 et seq.) because " '[t]o the handicapped elderly persons who would reside there, [the facility] would be their home, very often for the rest of their lives' "].) It is doubtful that such residents who need long-term medical and related intimate personal care in this setting would have a realistic opportunity to leave their rooms or contiguous areas, let alone the facility, even in the face of repeated conduct that impairs their dignity and interferes with or undermines medical or intimate personal care.

Seen in this light, even a legislature that shared plaintiff's "gender essentialist" views could conclude that a misgendering prohibition in this specific and narrow setting is crucial to foster quality medical and related intimate personal care for residents of such long-term care facilities. In other words, the desire to promote an environment in long-term care facilities conducive to the physical and mental well-being of residents living in such facilities justifies the pronouns provision irrespective of the Legislature's views concerning the content of any speech incidentally regulated by the pronouns provision. (Cf. *R. A. V.*, *supra*, 505 U.S. at p. 389 ["Another valid basis for according differential treatment to even a content-defined subclass of proscribable speech is that the subclass happens to be associated with particular 'secondary effects' of the speech, so that the regulation is '*justified* without reference to the content of the . . . speech' "].)

2. *The captive audience doctrine illuminates the long-term care context and informs assessment of the strength of the state's interest underlying the challenged provision*

Another aspect of the "context" (*Grutter, supra,* 539 U.S. at p. 327; *303 Creative, supra,* 600 U.S. at p. 600, fn. 6) pertaining to the state's interest identified above informs the freedom of speech inquiry. A series of high court decisions developing the captive audience doctrine under the First Amendment have upheld regulations restricting speech by protecting the interests of viewers or listeners who have no reasonable means of escape from seeing or hearing an unwelcome message that significantly intrudes upon privacy, autonomy, and corresponding medical care interests. These cases usefully inform an assessment of the strength of the state's interest underlying the challenged pronouns regulation.[12]

---

[12]    I view the doctrine's relevance in this case as confined to *informing the assessment* of the *strength* of the state's interest — and the discussion of cases that follows is presented with that limited purpose in mind. In considering the decisions in this constrained fashion and proceeding to analyze the challenged pronouns provision under traditional strict scrutiny rules, I find it unnecessary to determine whether the State is correct that the captive audience doctrine supports applying a more deferential intermediate scrutiny framework in considering plaintiff's challenge. Nor, in view of the limited relevance that I ascribe to the captive audience doctrine in the present case, do I find it necessary to address critiques of the doctrine by scholars, most notably found in Strauss, *Redefining the Captive Audience Doctrine* (1991) 19 Hastings Const. L.Q. 85. Instead, it is sufficient and useful simply to highlight what the high court has identified as core attributes of the captive audience doctrine, and to consult those cases as aids in assessing, under traditional strict scrutiny analysis, the strength of the state's interest relating to the challenged pronouns provision.

a. *High court decisions concerning home and
medical privacy settings*

As observed *ante*, majority opinion, part III.D.3., high court decisions developing the captive audience doctrine have upheld regulations of speech in order to afford protection of persons in and around their *homes.* (*Rowan v. Post Office Dept.* (1970) 397 U.S. 728, 737 (*Rowan*) [upholding a content-based regulation permitting residents to opt out of receiving sexually themed communications by mail]; *Pacifica, supra,* 438 U.S. at pp. 748–749 ["in the privacy of the home . . . the individual's right to be left alone plainly outweighs the First Amendment rights of an intruder. . . . One may hang up on an indecent phone call, but that option does not give the caller a constitutional immunity or avoid a harm that has already taken place"]; *Frisby v. Schultz* (1988) 487 U.S. 474, 487 (*Frisby*) [observing that "[t]he First Amendment permits the government to prohibit offensive speech as intrusive when the 'captive' audience cannot avoid the objectionable speech" and "[t]he target of the focused picketing banned by the . . . ordinance is just such a 'captive'" because "[t]he resident is figuratively, and perhaps literally, trapped within the home, and because of the unique and subtle impact of such picketing is left with no ready means of avoiding the unwanted speech"].)

Other captive audience decisions by the high court have concerned restrictions on free speech in the medical privacy setting. In *Madsen v. Women's Health Center, Inc.* (1994) 512 U.S. 753 (*Madsen*), the court addressed limitations on picketing and related activity outside a health clinic that performed abortions. Those who wished to protest challenged an injunction that imposed a 36-foot buffer zone and noise restrictions around the private clinic's entrances and driveway.

(*Id*. at p. 759.) The high court agreed with the state supreme court's determination that the government's "strong interest in residential privacy, acknowledged in *Frisby*[, *supra*,] 487 U.S. 474, applied by analogy to medical privacy," and it likewise agreed that whereas "targeted picketing of the home threatens the psychological well-being of the 'captive' resident, targeted picketing of a hospital or clinic threatens not only the psychological, but also the physical, well-being of the patient held 'captive' by medical circumstance." (*Id*. at p. 768.) The high court found "the combination of these governmental interests . . . quite sufficient to justify an appropriately tailored injunction to protect them." (*Ibid*.) It upheld the free speech buffer zone around the clinic entrances and driveway, and related noise restrictions (*id*. at pp. 770 & 772), while invalidating other more restrictive provisions that limited free speech rights more than necessary (*id*. at pp. 771 & 773–774).

Significantly for present purposes, in the course of its analysis the court observed: " ' "Hospitals, after all, are not factories or mines or assembly plants. They are hospitals, where human ailments are treated, where patients and relatives alike often are under emotional strain and worry, where pleasing and comforting patients are principal facets of the day's activity, and where the patient and his family . . . need a restful, uncluttered, relaxing, and helpful atmosphere." ' " (*Madsen, supra*, 512 U.S. at p. 772.) The court added: "The First Amendment does not demand that patients at a medical facility undertake Herculean efforts to escape the cacophony of political protests." (*Id*. at pp. 772–773.)

The high court reiterated and expanded upon these principles in *Hill v. Colorado* (2000) 530 U.S. 703 (*Hill*), addressing a criminal statute that prohibited knowingly

17

approaching within eight feet of another person near a health care facility, and without the other person's consent, for the purpose of leafleting, protesting, or counseling any other person. (*Id.* at p. 707.) In upholding the regulation, the court recognized the "significant difference between state restrictions on a speaker's right to address a willing audience and those [laws] that protect listeners from unwanted communication." (*Id.* at pp. 715–716.) It observed: "The right to free speech, of course, includes the right to attempt to persuade others to change their views, and may not be curtailed simply because the speaker's message may be offensive to his audience. *But the protection afforded to offensive messages does not always embrace offensive speech that is so intrusive that the unwilling audience cannot avoid it. Frisby*[*, supra,*] 487 U.S. 474, 487." (*Id.* at p. 716, italics added.) The court emphasized that a person's "privacy interest in avoiding unwanted communication varies widely in different settings. It is far less important when 'strolling through Central Park' than when 'in the confines of one's own home,' or when persons are 'powerless to avoid' it." (*Ibid.*) "More specific to the facts of this case," the court stated: "The unwilling listener's interest in avoiding unwanted communication has been repeatedly identified in our cases. It is an aspect of the broader 'right to be let alone' that one of our wisest Justices characterized as 'the most comprehensive of rights and the right most valued by civilized men.' *Olmstead v. United States* [(1928)] 277 U.S. 438, 478 (Brandeis, J., dissenting). The right to avoid unwelcome speech has special force in the privacy of the home, *Rowan*[*, supra,*] 397 U.S. 728, 738, and its immediate surroundings, *Frisby*[*, supra,*] 487 U.S. at 485, but can also be protected in confrontational settings" — including those

concerning "access to a medical facility." (*Hill*, at pp. 716–717, fn. omitted.)

The court in *Hill* summarized:  "We have . . . recognized that the 'right to persuade' . . . is protected by the First Amendment . . . .  Yet we have continued to maintain that 'no one has a right to press even "good" ideas on an unwilling recipient.'  *Rowan*[, *supra*,] 397 U.S. at 738.  None of our decisions has minimized the enduring importance of '*a right to be free' from persistent 'importunity*, following and dogging' after an offer to communicate has been declined.  While the freedom to communicate is substantial, 'the right of every person "to be let alone" must be placed in the scales with the right of others to communicate.'  *Id*., at 736.  It is that right, as well as the right of 'passage without obstruction,' that the . . . statute legitimately seeks to protect." (*Hill*, *supra*, 530 U.S. at pp. 717–718, italics added.)  The court concluded:  "Persons who are attempting to enter health care facilities — for any purpose — are often in particularly vulnerable physical and emotional conditions.  The State . . . has responded to its substantial and legitimate interest in protecting these persons from unwanted encounters, confrontations, and even assaults by enacting an exceedingly modest restriction on the speakers' ability to approach." (*Id*. at p. 729.)

b. *The* Aguilar *concurring opinion's reliance on the captive audience doctrine*

The concurring opinion relied on the captive audience doctrine in *Aguilar v. Avis Rent A Car System, Inc.* (1999) 21 Cal.4th 121 (*Aguilar*), in which we upheld an injunction barring a manager from continuing to violate the FEHA by using derogatory racial or ethnic epithets to target Hispanic employees in the workplace.  The concurring opinion first

highlighted the workplace setting, concluding that "workplaces and jobsites are not usually thought of as marketplaces for the testing of political and social ideas," and "strong public policies governing the workplace — both private and public — may justify some limitations on the free speech rights of employers and employees." (*Aguilar*, at pp. 158–159 (conc. opn. of Werdegar, J.).)

The concurring opinion next focused on the circumstance that the employees subject to the defendant's epithets constituted a "captive audience." (*Aguilar*, *supra*, 21 Cal.4th at p. 159 (conc. opn. of Werdegar, J.).) It reviewed many of the high court decisions discussed immediately above and concluded that the "relative captivity" of the plaintiffs in *Aguilar* "supports the restriction on defendant['s] . . . speech" because the employees were not "reasonably free to walk away when confronted with . . . racial slurs" at work. (*Id*. at pp. 160–161 (conc. opn. of Werdegar, J.).) The concurring opinion recognized that in many contexts, those subjected to objectionable speech are expected to just ignore it, avert their eyes, or walk away. But, the concurring opinion reasoned, "So long as avoiding unwelcome speech is — as here — sufficiently 'impractical' [citation], we can conclude listeners constitute a captive audience, *with the result that courts will show greater solicitude for their privacy and their right not to be forced to listen to unwelcome speech.*" (*Id*. at p. 161 (conc. opn. of Werdegar, J.), italics added.) The concurrence concluded that the employees' "status as forced recipients of [the defendant's] speech lends support to the conclusion that restrictions on his speech are constitutionally permissible . . . where the regulation of speech is limited solely to the workplace and the offended recipients constitute a captive audience." (*Id*. at p. 162 (conc. opn. of Werdegar, J.).)

c. *Plaintiff's misunderstanding of the captive audience doctrine — and proper application of that doctrine*

Plaintiff, acknowledging some of the decisions discussed above, asserts that the captive audience problem "is resolved in the cases by *denying access for some speakers to certain locations, like a person's home*, not by regulating the content of their speech." (Italics added.) Yet, as the State observes, "that merely restates the problem that the Legislature enacted [the LGBT Long-Term Care Residents' Bill of Rights] to address. Unlike people who reside in their own private homes, residents of long-term care facilities cannot simply 'deny[] access' to anyone they choose — especially not the very staff whom they depend on for 'necessary care and services.' (Stats. 2017, ch. 483, § 1, subd. (b), p. 3639.)"

Plaintiff also asserts that "the only 'captive audience' cases that permit *content-based* constraints on speech are locations like public schools and prisons where the state has compelled people to be present against their will." (Italics added.) Relatedly, plaintiff asserts, "[t]he 'captive audience' cases cited by Justice Werdegar in her concurring opinion in *Aguilar*[, *supra*,] 21 Cal.4th [at pages] 159–162, likewise dealt with rights of access for speech, not justification of content-based [regulation] of speech." But neither statement is correct. In *Rowan, supra*, 397 U.S. 728, the high court upheld a content-based regulation, permitting residents to opt out of receiving sexually themed mail in their homes; and in *Pacifica, supra*, 438 U.S. 726, the high court upheld a content based administrative condemnation against a radio station for broadcasting an "indecent" (*id.* at p. 729) monologue during hours when young children might be listening in their homes.

Plaintiff further argues: " '[T]he fact that society may find speech offensive is not a sufficient reason for suppressing it. Indeed, if it is the speaker's opinion that gives offense, that consequence is a reason for according it constitutional protection.' " (Quoting *Pacifica, supra*, 438 U.S. at pp. 745–746.) Yet the captive audience doctrine teaches that this principle does not hold when the offended party has no reasonable means to avoid the offensive speech. Ordinarily it is reasonable to require an "offended viewer . . . [to] avert his eyes [or ears]." (*Erznoznik v. City of Jacksonville* (1975) 422 U.S. 205, 212.) But when a captive listener has no choice but to hear the same offensive message "repeatedly" (Health & Saf. Code, § 1439.51, subd. (a)(5)), the doctrine contemplates that the state has more flexibility to restrict the message. (See *Frisby, supra*, 487 U.S. at p. 484 [distinguishing *Erznoznik* and explaining that, "in many locations, we expect individuals simply to avoid speech they do not want to hear," but "the home is different"].) As recognized by the concurring opinion in *Aguilar, supra*, 21 Cal.4th at page 161 (conc. opn. of Werdegar, J.), the teaching of the captive audience decisions is that concerning such persons, "courts will show greater solicitude for their privacy and their right not to be forced to listen to unwelcome speech." In sum, nothing in plaintiff's briefing casts doubt on my conclusion that the captive audience doctrine decisions discussed earlier help illuminate the narrow long-term care context at issue here, and inform an assessment of the strength of the state's interest in this matter.

3. *Conclusion regarding the state's interest*

In assessing the state's interest outlined previously, the circumstance that those whom the Legislature has sought to

protect — LGBT residents of long-term care facilities — also qualify as a *captive audience*, weighs heavily.

The residents of such facilities, including those who are transgender, are indeed captive, as that term is understood and applied in the high court decisions. They are constrained to receiving medical and related intimate personal care in what have become their *homes*. As noted, plaintiff relies on decisions such as *Meriwether, supra,* 992 F.3d 492, which rejected a university's bar on misgendering in an academic context — a quintessential " ' "marketplace of ideas" ' " forum for debate about social issues. (*Id*. at p. 505; see also *Keyishian v. Board of Regents* (1967) 385 U.S. 589, 603 [a university "classroom is peculiarly the 'marketplace of ideas' "].) Likewise, plaintiff relies on the high court's decision in *303 Creative, supra,* 600 U.S. 570. In that matter, the court characterized wedding planning internet pages as reflecting " 'an uninhibited marketplace of ideas' " (*id*. at p. 585) presenting the artistic work of "creative professionals" (*id*. at p. 590) who provide individualized "expressive services" (*id*. at p. 599). The court exempted the plaintiff from the state's public accommodations law, determining that she could not be compelled to create personalized pages for same-sex couples against her religious views and conscience concerning marriage. (*Id*. at p. 603.)

Assuming such decisions are generally pertinent, in the present case we are dealing neither with such marketplace of ideas settings, nor with such speakers. Instead, the legislation aims to protect a marginalized and captive audience's interests in a wholly different and confined place — their care and living quarters — by regulating those who are employed to attend such persons, in order to promote, and not impair, medical and related intimate personal care. It is doubtful that such

residents, including those who are transgender, would have a realistic opportunity to move to different housing or to another facility — even in the face of repeated conduct that affronts residents' dignity and interferes with or undermines medical and related intimate personal care.

The Court of Appeal below determined that the challenged pronouns provision advances a compelling state interest, which that court viewed as protecting long-term care residents' rights to dignity, and to be free from discrimination. (*Taking Offense, supra*, 66 Cal.App.5th at pp. 720–721.) As alluded to previously, this characterization of the state's interest is overly general and unfocused. Instead, and bearing in mind the residents' status as a captive audience, together with the Legislature's findings and the academic literature outlined *ante*, part I.A.1. (describing the relevant context), the challenged provision protects a more narrowly defined compelling interest. To reiterate and summarize: Health and Safety Code section 1439.51, subdivision (a)(5) advances a compelling state interest in the context of long-term care by protecting the rights of such residents to be free from discrimination that targets a legally protected characteristic, when that conduct is committed by the staff of a long-term care facility whose job is to provide and support medical treatment and intimate personal care. The challenged provision facilitates the ability of such seniors to obtain long-term medical and related intimate personal care in an environment that is conducive to, and does not undermine, such care.

## B. The Pronouns Provision Is Narrowly Tailored to Achieve the State's Compelling Interest

The Court of Appeal and plaintiff maintain that Health and Safety Code section 1439.51, subdivision (a)(5)'s pronouns

provision is overinclusive. In addressing this argument, it is useful to bear in mind that strict scrutiny "requires that [a law] be narrowly tailored, not that it be 'perfectly tailored.'" (*Williams-Yulee v. Florida Bar* (2015) 575 U.S. 433, 454.)

### 1. *The Court of Appeal's misunderstanding of the statute's scope*

The Court of Appeal broadly characterized Health and Safety Code section 1439.51, subdivision (a)(5) as prohibiting "even occasional, isolated, off-hand instances of willful misgendering" so long as "there has been at least one prior instance" of misgendering. (*Taking Offense*, *supra*, 66 Cal.App.5th at p. 720.) Yet by its terms, the statute proscribes only "willfully and *repeatedly*" misgendering of a resident who has "clearly informed [the facility or staff] of the [resident's] preferred name or pronouns." (Health & Saf. Code, § 1439.51, subd. (a)(5), italics added.) Moreover, the statute applies only to conduct that is undertaken "wholly or partially *on the basis of* a [resident's] actual or perceived sexual orientation, gender identity, gender expression, or human immunodeficiency virus (HIV) status." (*Id*., subd. (a), italics added.) In this context, "on the basis of" is synonymous with "'because of.'" (Cf. *Franklin v. Gwinnett County Public Schools* (1992) 503 U.S. 60, 75.)

At least initially, it may be difficult for some staff persons, even those who in good faith seek to comply with a resident's clearly stated preference, to overcome long-practiced patterns of speech, and to use pronouns different from those they would normally employ. (Cf. Clarke, *They, Them, and Theirs* (2019) 132 Harv. L.Rev. 894, 957 [although "[m]ost transgender people, including many who identify as nonbinary, use gendered pronouns such as he and she," 29 percent of transgender persons

surveyed "use 'they/them' pronouns" — and a small percentage use "even more unfamiliar pronouns"]; see also *id.* at p. 957, fns. 383–385.)

In any event, as the State observes: "A staff member who fails to use a resident's proper pronouns because of unfamiliarity with new or infrequently used words, or [has good-faith] genuine difficulties when initially learning certain grammatical usages, is not 'willfully' acting 'on the basis of' the resident's gender identity or sexual orientation. For an action to be 'willfully' taken 'on the basis' of gender identity or sexual orientation, such traits must 'actually play[] a role' in the staff member's 'decisionmaking process.' " (Quoting *Hazen Paper Co. v. Biggins* (1993) 507 U.S. 604, 610.)

The Legislature, doubtless aware of these issues, expressly and narrowly confined violations to those reflecting *willful and repeated* failure to use a resident's correct pronouns, after being clearly informed of those pronouns, *because of* a resident's actual or perceived gender identity, or related protected bases. It does not sweep up staff persons who, despite their good faith efforts, inadvertently or occasionally use an incorrect pronoun for a resident.

> 2. *The assertion that the statute proscribes misgendering without also requiring that such behavior amount to harassing or discriminatory conduct as those terms are legally defined*

Drawing on "the workplace context as an analogy" (*Taking Offense, supra*, 66 Cal.App.5th at p. 720), the Court of Appeal faulted Health and Safety Code section 1439.51, subdivision (a)(5) for proscribing misgendering "without [also] requiring that such . . . [behavior] amount to harassing or discriminatory conduct" "as those terms are legally defined." (*Taking Offense*,

at p. 720.) Preliminarily, as suggested by amici curiae Lambda Legal Defense Fund, Inc., National Center for Lesbian Rights, ACLU of Southern California, et al., I note that the *housing* context — in addition to the employment context — is relevant in assessing what constitutes harassment in a long-term residential care setting.[13] In any event, as observed *ante*, majority opinion, part III.D.4., we view the Legislature as having intended to proscribe conduct that — like the conduct proscribed by Title VII (42 U.S.C. § 2000e et seq.; Title VII) — amounts to harassment or discrimination under an objective and subjective test. As previously defined, this is: (1) conduct that is severe or pervasive enough to create an objectively hostile environment, and (2) an environment that the affected party "subjectively perceive[s] . . . to be abusive." (*Harris v. Forklift Systems, Inc.* (1993) 510 U.S. 17, 21.) This understanding of the challenged provision is consistent with the Legislature's apparent intent reflected in its findings (Stats. 2017, ch. 483, § 1, subds. (a)–(e)) and the accompanying legislative history. Moreover, this construction advances the state's compelling interest while "burden[ing] no more speech than necessary." (*Madsen, supra,* 512 U.S. at p. 765.)

### 3. *The assertion that the statute does not require that any given misgendering have harmed a resident*

The Court of Appeal also faulted Health and Safety Code section 1439.51, subdivision (a)(5) on the ground that, as it understood the provision, a long-term residential care facility

---

[13] As amici curiae observe, long-term care facilities are their residents' *homes*, and courts "have recognized that the threshold for finding harassment severe or pervasive in the housing context may be lower because of the particularly grievous nature of the invasion."

staff person might be found in violation without evidence that misgendering "negatively affect[ed] any resident's access to care or course of treatment." (*Taking Offense, supra,* 66 Cal.App.5th at p. 720.)

As an initial matter, the Legislature concluded that misgendering in the long-term residential care facility context poses, or risks, exactly such harm. (Stats. 2017, ch. 483, § 1, subds. (a)–(e).) Moreover, and most significantly, the specific conduct proscribed by the challenged provision is both (1) conduct that is sufficiently severe or pervasive to create an objectively hostile environment, and (2) conduct that residents subjectively perceive as abusive. As explained *ante*, majority opinion, part III.D.4., the requirement that a resident has clearly informed the facility or staff member of their pronouns is closely analogous to Title VII's requirement that a plaintiff show subjective harm. This gives effect to the Legislature's apparent intent reflected in its findings and the accompanying legislative history mentioned earlier; and it advances the state's compelling interest while "burden[ing] no more speech than necessary." (*Madsen, supra,* 512 U.S. at p. 765.)

Finally, assuming for the sake of argument that enforcement of the statute in a context in which the State had not shown harm to a resident would infringe on protected speech, plaintiff has not met its burden to demonstrate that such an application would represent " ' " ' the generality' " [citation] or "vast majority" ' of cases." (*People v. Martinez* (2023) 15 Cal.5th 326, 352 (*Martinez*).)

### C. The Statute Is Not Overbroad Even Though It Applies in Some Circumstances Outside the Presence of a Long-Term Care Resident

The Court of Appeal faulted Health and Safety Code section 1439.51, subdivision (a)(5) for failing to confine its reach to speech undertaken "in the . . . presence" of a resident who has clearly stated a particular pronoun preference. (*Taking Offense*, *supra*, 66 Cal.App.5th at p. 721; see *id*. at pp. 720–721.) Plaintiff likewise appears to understand that the statute applies when a staff member speaks directly with a resident, or with others in the resident's presence; and also when a staff member writes or enters information in "official records or business records concerning the resident."[14] But, plaintiff asserts, the statute is overbroad to the extent it is construed to regulate a staff member who misgenders a resident elsewhere in the facility outside the resident's immediate presence; when the staff person does so outside the facility; when the staff person does so while engaging in "personal, advocacy, academic, political, ideological, polemic, educational and / or other writings that mention" a specific resident; when the staff person does so in the course of "writing about [a] resident after the death of the resident"; or when the staff person does so while "engaging in forms of expression, including, but not limited to, speaking, writing, art, music, videos and other expressive media."

---

[14] A separate provision, which plaintiff has not challenged, governs recordkeeping. (See Health & Saf. Code, § 1439.52 ["A facility shall employ procedures for recordkeeping, including, but not limited to, records generated at the time of admission, that include the gender identity, correct name, as indicated by the resident, and pronoun of each resident, as indicated by the resident"].)

As explained *ante*, majority opinion, part III.D.4.b., we construe Health and Safety Code section 1439.51, subdivision (a)(5) as governing willful and repeated misgendering by the staff of a long-term care facility not only (1) when such conduct occurs within the presence of a resident who either hears or sees such conduct, but also (2) in certain circumstances outside the presence of a resident about which the resident has awareness.

Namely, the provision is properly viewed as applying to long-term care facility staff throughout the interior and exterior grounds of the facility's campus who so misgender a resident in communications with other staff, residents, or visitors, even when such misgendering occurs outside that resident's hearing or sight, yet in conjunction with the staff person's job-related role. It also applies when there exists evidence that the resident has become aware of, and hence perceived, such misgendering directed at that resident. Yet the prohibition does not reach conduct or expression that occurs outside the campus of a long-term residential care facility, and that also is outside the business-related role of its staff.

Once again, this understanding of Health and Safety Code section 1439.51, subdivision (a)(5)'s scope is consistent with the Legislature's apparent design reflected in its findings and the accompanying legislative history. Moreover, such an interpretation of the statute's scope is appropriate and necessary in order to address the state's compelling interest in adopting the statute.

So viewed, and contrary to the Court of Appeal's determination, I conclude Health and Safety Code section 1439.51, subdivision (a)(5) is not overbroad, even though it applies, in some circumstances, to proscribed misgendering

committed by long-term care staff outside the immediate presence (by hearing or sight) of a resident who has clearly expressed a preference to be referred to by a particular name or pronoun.  And once again, construing the challenged provision in this manner advances the state's compelling interest while "burden[ing] no more speech than necessary."  (*Madsen, supra,* 512 U.S. at p. 765.)[15]

Finally, even assuming for the sake of argument that application of the misgendering prohibition in one of plaintiff's hypothetical enforcement scenarios would not withstand strict scrutiny, that possibility is no ground for declaring the misgendering prohibition facially invalid.  (*Martinez, supra,* 15 Cal.5th at p. 352.)

---

[15]    This determination is consistent with the high court's admonition in *Madsen, supra,* 512 U.S. at page 773, concerning the special context of medical facilities — and by necessary extension, related entities that provide intimate personal care.  In *Madsen,* as noted previously, the court observed that such facilities " ' "are not factories or mines or assembly plants" ' " but places " ' "where human ailments are treated, where patients and relatives alike often are under emotional strain and worry, where pleasing and comforting patients are principal facets of the day's activity, and where the patient and his family . . . need a restful, uncluttered, relaxing, and helpful atmosphere." ' " (*Id.* at p. 772.)  Relatedly, it is relevant that the state endeavors to accomplish its narrow and focused compelling interest in a setting that is far from a traditional marketplace of ideas (cf. *Meriwether, supra,* 992 F.3d 492; *303 Creative, supra,* 600 U.S. 570), and in which those sought to be protected are a captive audience in what amounts to their own homes.

### D. Plaintiff Fails to Propose Any Equally Effective but Less Restrictive Alternative

Despite my conclusion that the challenged pronouns provision is sufficiently narrowly tailored as we have construed it, plaintiff argues that the provision fails an appropriately strict ends-means inquiry because, assertedly, the statute is not the least restrictive method of accomplishing the state's compelling interest. (See *Ashcroft*, *supra*, 542 U.S. at p. 665 [a challenged provision is " 'unacceptable if less restrictive alternatives would be at least as effective in achieving the legitimate purpose that the statute was enacted to serve' "]; see generally *Strict Judicial Scrutiny*, *supra*, 54 UCLA L.Rev. at p. 1326 [characterizing this analysis as "express[ing] essentially the same demand" as the narrow tailoring inquiry].) As explained below, I disagree with plaintiff's position.

First, plaintiff alleges, the "law could be restricted to . . . facility-related communications, oral and written, rather than including all forms of speech in all contexts whatsoever." This is, however, essentially how we construe the provision. Again, as observed *ante*, majority opinion, part III.D.4.b., we view Health and Safety Code section 1439.51, subdivision (a)(5) as governing willful and repeated misgendering by the staff of a long-term care facility when such conduct occurs within the hearing or sight of a resident, or about which a resident has become aware. So understood, the provision properly applies throughout the interior and exterior grounds of a long-term care facility campus and covers staff who repeatedly and willfully misgender a resident in communications with other staff, residents, or visitors. The provision also is reasonably understood to cover all spoken (including by telephone, voicemail, or other recordings) and written communications

prepared or undertaken by facility staff in the course of business, including those made and kept as part of a resident's official files.

Second, plaintiff argues that enforcement of the challenged provision "could be placed within standard employment law policies and processes with their administrative and judicial procedures, resulting in cautions, injunctions and possible termination." In other words, the appellate court below related, plaintiff proposes to rely on "administrative employment law enforced by the [FEHA] Agency, with its attendant due process rules and regulations." (*Taking Offense*, *supra*, 66 Cal.App.5th at pp. 718–719.) Even assuming the FEHA provides residents with such a private right of action (but see *Taking Offense*, at p. 719 [noting Attorney General's assertion that it does not]), such an approach "would create an excessively high burden by requiring elderly residents to file administrative claims or possibly civil lawsuits." (*Ibid*. [describing Attorney General's position].) Nor would it provide an effective method for protecting the state's interest in ensuring that long-term care facility residents do not suffer from abuse and discrimination in the facilities where they live and receive care. I agree with the State that plaintiff has not proposed an equally effective less restrictive alternative.

Third, raising an argument that apparently was not asserted below, plaintiff perfunctorily suggests that "long-term care facility owners could be directed or encouraged to survey their employees for their willingness to voluntarily . . . abide by" the pronouns provision, and "assign only willing employees to positions involving resident contact or communications." Assuming such a scheme would advance the state's earlier described compelling interest to some extent, it would not do so

as effectively as the challenged provision. We are here addressing facilities that provide medical treatment and related intimate personal care — "not factories or mines or assembly plants." (*Madsen, supra,* 512 U.S. at p. 772.) Long-term care facilities require employees who are able and willing to attend to all patients within a facility. In practice, this means, for example, that when called into a resident's room to assist with a medical or related intimate personal care task, a staff person must be ready, willing, and able to perform and interact, in accordance with basic norms of professional conduct (and consistently with each resident's rights under the enactment, including intimate autonomy privacy rights).[16] The proper care of a resident cannot be contingent on finding a different "willing" staff member to respond in circumstances calling for immediate attention. In this sense, plaintiff's suggested alternative does not qualify as an equally effective less restrictive means of accomplishing the state's compelling interest.

Relatedly, plaintiff again suggests in perfunctory fashion that "by law or employment regulation the State should enable long-term care facilities to *hire* employee[s] who have no linguistic, moral or other objections to abiding by" the challenged pronouns provision. (Italics added.) Plaintiff suggests this would "enable[] the [staff] employee to do his / her job [as] needed for the benefit of people with whom the employee interacts." As an initial matter, plaintiff's last point is correct — each staff person employed at a long-term care facility should be

---

[16] As observed previously, Health and Safety Code section 1439.53, subdivision (b), affords residents authority, when partially or fully unclothed, to exclude facility staff who are not directly involved in providing intimate personal care.

able to do that person's job as needed for the benefit of the long-term care residents of the facility. Indeed, we might assume that is a basic minimum qualification for employment at such entities. Although plaintiff's position is unclear, apparently it means to suggest that employers might be permitted to restrict new hiring to such persons, viewing willingness to comply with the LGBT Long-Term Care Residents' Bill of Rights as a legally permissible "bona fide occupational qualification." (Cf. *Automobile Workers v. Johnson Controls, Inc.* (1991) 499 U.S. 187, 200 [under federal law an employer may discriminate only when " 'religion, sex, or national origin is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise' "].) Plaintiff does not suggest what should happen regarding existing employees who object and decline to abide by the challenged pronouns provision. But presumably plaintiff contemplates that such objecting employees would be exempted from tending to long-term care residents who clearly inform them that they use pronouns that the staff person then refuses to use. This, however, simply returns us to the same problem noted in the previous paragraph: Long-term care facilities require staff who are able and willing to care for *all* patients within a facility consistent with the rights of such residents. The facilities cannot properly function if staff are free to refuse to do their job, requiring the facilities to summon and wait for a staff member who has agreed to obey the law. Again, this proposed alternative does not qualify as an equally effective less restrictive means of accomplishing the state's compelling interest.

## II. CONCLUSION

As explained *ante*, majority opinion, part III.D., we conclude that Health and Safety Code section 1439.51, subdivision (a)(5) is properly analyzed, and upheld, as a regulation of discriminatory conduct that incidentally affects speech — and is not subject to scrutiny under the First Amendment as an abridgment of the freedom of speech.  In any event, as shown in this concurring opinion, the Court of Appeal below erred in holding the challenged statute facially invalid even under that exacting mode of analysis.

Health and Safety Code section 1439.51, subdivision (a)(5), advances a compelling state interest in the context of long-term care by protecting the rights of such residents to be free from discrimination that targets a legally protected characteristic, when that conduct is committed by the staff of a long-term care facility whose job is to provide and support medical treatment and intimate personal care.  Moreover, contrary to the Court of Appeal below, the challenged statute is sufficiently narrowly tailored, and not overbroad.  Finally, the provision survives the least restrictive alternative test articulated and applied in *Ashcroft, supra*, 542 U.S. at pages 665–668, and, as explained *ante*, majority opinion part III.G., the prospect of criminal penalties to address egregious violations does not warrant invalidation on its face.

**GUERRERO, C. J.**

**We Concur:**

**CORRIGAN, J.**
**GROBAN, J.**

TAKING OFFENSE v. STATE OF CALIFORNIA

S270535


Concurring Opinion by Justice Kruger


I concur in part and concur in the judgment. I agree with the majority that Taking Offense lacks standing to sue under Code of Civil Procedure section 526a. (Maj. opn., *ante*, at pt. II.A–F.) I also agree that, in the unusual circumstances of this case, it is nevertheless appropriate for this court to address the merits of the Court of Appeal's decision invalidating the pronouns provision of the Lesbian, Gay, Bisexual, and Transgender Long-Term Care Facility Residents' Bill of Rights. (Stats. 2017, ch. 483, p. 3638, amending Health & Saf. Code, div. 2, to add ch. 2.45; see Health & Saf. Code, § 1439.51, subd. (a)(5) [pronouns provision].) (Maj. opn., *ante*, at pt. II.G.) And finally, I agree that the Court of Appeal's decision was based on a mistaken interpretation of that provision. (Maj. opn., *ante*, at pt. III.D.4.) I would, however, reverse the Court of Appeal's decision solely on the basis of that interpretative mistake, leaving any further consideration of constitutional questions until a litigant has established its standing to sue.

"In general, California law does not give a party personal standing to assert rights or interests belonging solely to others." (*Yvanova v. New Century Mortgage Corp.* (2016) 62 Cal.4th 919, 936.) Although this limitation is not coextensive with the standing requirements applicable in federal court, it likewise reflects important "prudential and separation of powers considerations." (*Weatherford v. City of San Rafael* (2017) 2 Cal.5th 1241, 1249.) Standing requirements restrain litigation

1

and the burdens that attend it.  By limiting the circumstances in which courts become involved in disputes, standing helps to prevent judicial intrusion on the prerogatives of the other branches of government.  Standing also helps to ensure that when courts do resolve disputes, they have the benefit of a concrete dispute between adverse parties.

The concerns underlying the standing requirement have special force when litigants seek to challenge legislation on constitutional grounds.  Constitutional holdings persist absent a constitutional amendment or a judicial decision overruling the prior one.  The risk of error is particularly significant in a system of adjudication, like ours, that adheres to the principle of stare decisis; if judicial precedents are to be disturbed only rarely, they should be rendered only when necessary, and with as much context and information as circumstances allow.  This is one of the reasons why we do not typically entertain constitutional arguments premised on how a law affects some other person or set of persons not before the court.  (See *In re Cregler* (1961) 56 Cal.2d 308, 313 ["one will not be heard to attack a statute on grounds that are not shown to be applicable to himself"].)  It is likewise a reason why we require litigants who seek to invalidate the work of the legislative branch to establish their standing to do so.

Here, I agree with the majority that Code of Civil Procedure section 526a, which speaks of suits against a "local agency," does not confer standing to bring this pre-enforcement constitutional challenge against the State of California.  (Code Civ. Proc. § 526a, subd. (a); see maj. opn., *ante*, at pts. II.B–F.)  No other basis for standing is presently apparent.  Taking Offense has not demonstrated that it has suffered injury.  There are myriad other potential plaintiffs to whom the law applies,

2

who are entirely capable of asserting their own rights, and who could assist the court's deliberations by speaking to the pertinent interests and concerns arising in the relevant field. And there is no evident basis on which to extend common law taxpayer standing to a taxpayer who seeks to assert another's constitutional challenge to the validity of state legislation, as opposed to, for instance, a taxpayer who seeks to challenge governmental action as ultra vires. (See *Silver v. City of Los Angeles* (1961) 57 Cal.2d 39, 40–41.)

In the unusual circumstances of this case, however, I agree with the majority that it is appropriate to reach the merits of the Court of Appeal's decision to the limited extent necessary to address the "cloud over the constitutionality of the statute" cast by that decision. (Maj. opn., *ante*, at p. 27; see *id.*, pt. II.G.) As I see it, addressing that issue is a relatively simple matter.

The Court of Appeal invalidated the pronouns provision based on a mistaken understanding of what that provision requires. (*Taking Offense v. State of California* (2021) 66 Cal.App.5th 696, 716–721 (*Taking Offense*).) The court acknowledged "that the state has a compelling interest in eliminating discrimination on the basis of sex," including "discrimination on the basis of sexual orientation or transgender status." (*Id.* at p. 717.) But it deemed the pronouns provision inadequately tailored to that interest, because the court understood the provision to "prohibit[] . . . isolated remarks not sufficiently severe or pervasive to create an objectively hostile . . . environment." (*Taking Offense*, at p. 720.) "Rather than prohibiting conduct and speech amounting to actionable harassment or discrimination as those terms are legally defined," the court reasoned, "the law criminalizes even occasional, isolated, off-hand instances of willful misgendering

. . . without requiring that such occasional instances of misgendering amount to harassing or discriminatory conduct." (*Ibid.*)

As the majority explains, the pronouns provision does not sweep so broadly. (Maj. opn., *ante*, at pt. III.D.4.) Properly construed, that provision requires a showing that closely resembles the showing required to establish discrimination under title VII of the Civil Rights Act of 1964 (Title VII) (42 U.S.C. § 2000e et seq.). (Maj. opn., *ante*, at pt. III.D.4.) And it is unquestioned that Title VII may constitutionally be applied to uses of language that amount to discrimination. (See *R. A. V. v. City of St. Paul* (1992) 505 U.S. 377, 389–390; *Aguilar v. Avis Rent A Car System, Inc.* (1999) 21 Cal.4th 121, 134–137 (plur. opn.); see also *id.* at p. 154, fn. 6 (conc. opn. of Werdegar, J.).)

Once the pronouns provision is properly understood, it becomes clear that the Court of Appeal was wrong to invalidate it on the ground that the provision does not require a showing of conduct or speech "amounting to actionable harassment or discrimination." (*Taking Offense*, *supra*, 66 Cal.App.5th at p. 720.) Because the Court of Appeal's invalidation of the pronouns provision rests on a mistaken statutory interpretation, the court's decision should be reversed.

In my view, such a reversal would suffice to lift the cloud cast by the appellate court's decision. In recognition of the important prudential and separation of powers principles that underlie our standing doctrine, I would go no further. Any additional questions about the validity of the statute should be addressed only after a challenger has established its standing to invoke the courts' power of judicial review.

**KRUGER, J.**

**I Concur:**

**LIU, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  Taking Offense v. State of California

_____

**Procedural Posture** (see XX below)
**Original Appeal**
**Original Proceeding**
**Review Granted (published)** XX 66 Cal.App.5th 696
**Review Granted (unpublished)**
**Rehearing Granted**

_____

**Opinion No.** S270535
**Date Filed:** November 6, 2025

_____

**Court:**  Superior
**County:**  Sacramento
**Judge:**  Steven M. Gevercer

_____

**Counsel:**

Llewellyn Law Office and David L. Llewellyn, Jr., for Plaintiff and Appellant.

William J. Becker, Jr., Paul Hoffman; Keiter Appellate Law and Mitchell Keiter for Freedom X as Amicus Curiae on behalf of Plaintiff and Appellant.

Rob Bonta, Attorney General, Matthew Rodriquez, Acting Attorney General, Michael J. Mongan, State Solicitor General, Thomas S. Patterson, Assistant Attorney General, Janill L. Richards and Samuel T. Harbourt, Deputy State Solicitors General, Tamar Pachter, Paul Stein and Anna T. Ferrari, Deputy Attorneys General, and Nicole Welindt, Associate Deputy State Solicitor General, for Defendant and Respondent.

Lieff Cabraser Heimann & Bernstein, Kelly M. Dermody and Miriam E. Marks for Scholars in Social Work, Gerontology and Social Science as Amici Curiae on behalf of Defendant and Respondent.

Eric M. Carlson for the California Commission on Aging, SAGE, Justice in Aging, California Advocates for Nursing Home Reform and Openhouse as Amici Curiae on behalf of Defendant and Respondent.

Christina Paek, Nora Huppert, Karen Loewy; Shannon Minter, Christopher Stoll, Amy Whelan; and Amanda C. Goad for Lambda Legal Defense and Education Fund, Inc., National Center for Lesbian Rights, American Civil Liberties Union of Northern California, American Civil Liberties Union of Southern California, API Equality-LA, Bay Area Lawyers for Individual Freedom, Bet Tzedek Legal Services, California Employment Lawyers Association, California Womens Law Center, Center for Constitutional Rights, Equal Rights Advocates, Equality California, GLBTQ Legal Advocates & Defenders, Impact Fund, Legal Aid at Work, National Center for Transgender Equality, National Employment Lawyers Association, National LGBTQ+ Bar Association, National Women's Law Center, Tom Homann LGBTQ+ Law Association, Trans Lifeline, Transgender Law Center, Transgender Legal Defense & Education Fund and TransLatin@ Coalition as Amici Curiae on behalf of Defendant and Respondent.

Keker, Van Nest & Peters, Sharif E. Jacob and Luis G. Hoyos for California Professors of Freedom of Expression and Equality Law as Amici Curiae on behalf of Defendant and Respondent.

Hanson Bridgett, Joel S. Goldman; Sideman & Bancroft and Daniel R. Redman for California Assisted Living Association as Amicus Curiae on behalf of Defendant and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

David L. Llewellyn, Jr.
Llewellyn Law Office
8139 Sunset Avenue, #176
Fair Oaks, CA 95628
(916) 966-9036

Samuel T. Harbourt
Deputy State Solicitor General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102
(415) 510-3919